# EXHIBIT 19

11/28/2004   11:39   9297742485   KAZIE BOTTLING

## STATUS CHANGE

**EMPLOYEE NAME:** GERALD NEZ    Employee No. 14299
Print clearly

Department: 3900

**LOCATION:** Tucso        El Paso ☐     Flagstaff X

| | |
|---|---|
| Voluntary ___ Reas | 120·00 + |
| Termination ___ Reas | 37·58 + |
| Layoff ___ Reas | 157·58 * |

Last Day Worked: _

Was notice given? yes ☐

6·90 +
12·90 +      on Date: _-_-_
8·46 +       Rehire: yes ☐ no ☐
28·26 +

158·58 x
6·4      te: _-_-_
63·43 +

From Dept: _____

### VACATIO         FLOATER TIME OFF

To be paid in advance? Ye

28·26 x
0·5      cation Day(s)
16·96     ur(s)
out Pay

**DATES:**

Beginning ___-__-___   E     16·96   o Work on: _-_-_
# Days Requested: ___ #    63·43   maining: ___
Other Comments: _____     80·39  *

President's Day Floater to be taken between 1/12/04 - 3/26/04 (exceptions with approval only)

### RATE CHANGE

Current Rate: $ 7.05     NEW Rate: $ 7.45 per hr

Effective Date: 09-29-04     Percent/Amount Increase ___

Reason for Change  30 day increase

New Classification: _____ New Department: _____

#### JOB PERFORMANCE

ATTENDANCE:
Excellent ☐
Average ☐
Poor ☐

CONDUCT
Excellent ☐
Average ☐
Poor ☐

ABILITY
Excellent ☐
Average ☐
Poor ☐

#### ADDITIONAL COMMENTS

| | |
|---|---|
| 10/5 | 46.90 |
| 10/12 | 37.58 |
| 10/19 | 52.90 |
| 10/26 | 48.46 |

#### PERSONNEL DEPT USE ONLY

not rec in
Tucson TN
11-8-04 Pay
do edi
Soc missed
wages

### CHANGE OF ADDRESS – PHONE     Effective Date of change: __/__/__

New Address: _____

| Number | Street Name | Apt # | City | State | Zip |
|---|---|---|---|---|---|

Home Telephone: (___) ___-___   Cell: (___) ___-___   Other Info: _____

Employee signature verifying above Information: _____

By John Aflo     Date: 9/29/04
Department Supervisor / Department Manager

By Qcey Christie     Date: 9/29/04
Office Manager / Location Manager

Received in Corporate Personnel Dept on: __/__/__ Initials ___

EEOC-KBC-00060

11/08/2004  11:33   9297792485   KRLIL BULLING

# STATUS CHANGE

**EMPLOYEE NAME:** _Gerald Nez_
Print clearly

**Employee No.** _14799_
**Department:** _3900_

**LOCATION:**    Tucson ☐    Phoenix ☐    El Paso ☐    Flagstaff ☒

---

### SEPARATION

| | | |
|---|---|---|
| Voluntary | ____ | Reason:_____ |
| Termination | ____ | Reason:_____ |
| Layoff | ____ | Reason:_____ |

Last Day Worked:___-___-___          Separation Date:___-___-___

Was notice given? yes ☐   no ☐   If so, how much?_____ Rehire: yes ☐ no ☐

### TRANSFER

From Dept: _____ To: _____ Effective Date: ___-___-___

### VACATION – HOLIDAY - FLOATER TIME OFF

To be paid in advance? Yes ☐ No ☐     ☐ Vacation Day(s)
                                        ☐ Floater(s)
**DATES:**                              ☐ Without Pay

Beginning ___-___-___   Ending ___-___-___   Returning to Work on:___-___-___

# Days Requested: ____ # Days Available: ____ # Days Remaining: ____
Other Comments: _____

President's Day Floater to be taken between 1/12/04 – 3/26/04 (exceptions with approval only)

### RATE CHANGE

Current Rate: $ _7.45_          NEW Rate: $ _7.85_ per _hr_

Effective Date: _10-27-04_       Percent/Amount Increase _____

Reason for Change: _60 day review and raise_

New Classification: _____ New Department: _____

**JOB PERFORMANCE**

ATTENDANCE:
Excellent ☐
Average ☐
Poor ☐

CONDUCT
Excellent ☐
Average ☐
Poor ☐

ABILITY
Excellent ☐
Average ☐
Poor ☐

**ADDITIONAL COMMENTS**
_____
_____
_____
_____
_____
_____
_____

**PERSONNEL DEPT USE ONLY**
_____
_____
_____
_____
_____

---

**CHANGE OF ADDRESS – PHONE**          Effective Date of change: ___/___/___

New Address:_____
Number    Street Name    Apt #         City      State    Zip

Home Telephone: (____) ____-____   Cell: (____) ____-____   Other Info:_____

Employee signature verifying above information: _____

By: _Stev M Cully_                Date: _11, 3, 04_
Department Supervisor / Department Manager

By: _Ray Christie_                Date: _10, 26, 04_
Office Manager / Location Manager

Received in Corporate Personnel Dept on: ___/___/___ Initials ____

EEOC-KBC-00062

# EXHIBIT 20

**Daniel Lorber, MD, FACP, CDE**
**73 Essex Court**
**Port Washington, NY, 11050-4222**
**718 762-3111**
dll55@columbia.edu
SSN: 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

September 04, 2008

Mr. P. David Lopez
U.S. Equal Employment Opportunity Commission
Phoenix District Office
3300 North Central Avenue, Suite #690
Phoenix, AZ 85012-2504

RE: EEOC Charge #: 350-2005-02442

Gerald Y. Nez versus Kalil Bottling Co.

Dear Mr. Lopez:

   I am a treating physician, medical educator, and medical investigator in the City and State of New York in the United States, where I specialize in endocrinology. I have been engaged in the clinical practice of endocrinology for more than 31 years. I also work at the New York Hospital Medical Center Queens, in Flushing, New York, where I supervise the care of patients in a teaching hospital. In my practice, other physicians and I see approximately 300 patients per week. I personally examine and treat approximately 80 patients a week, of whom 50 to 60 have diabetes.

I received a B.A. degree from Columbia University in 1964 and an M.D. degree from the Albert Einstein College of Medicine of Yeshiva University in 1972. After medical school, I completed a one-year internship in medicine and a two-year residency in internal medicine at the Albert Einstein College of Medicine. I was then awarded and completed a fellowship in endocrinology at Vanderbilt University Medical Center in Nashville, Tennessee.

I became a diplomate of the American Board of Internal Medicine in 1975, and a diplomate in endocrinology of the same Board in 1977. I was certified by the National Board for Diabetes Educators in 1991 and then subsequently recertified in 1996, 2001, and 2006. Since 1977, I have practiced clinical medicine with a specialization in endocrinology, diabetes, and metabolism.

From 1975 to 1977, I was an instructor at Vanderbilt University School of Medicine. From 1977 to 1984, I was assistant dean and an assistant professor of clinical medicine at New York University School of Medicine. From 1984 to 1987, I was an assistant clinical professor of medicine, and from 1987 to 1994, an associate clinical professor of medicine at Albert Einstein College of Medicine. Since 1994, I have been a clinical associate professor of medicine at Weill Medical College of Cornell University in New York City.

In addition to my academic appointments, I was the coordinator in the division of endocrinology in the department of medicine at the Booth Memorial Medical Center in Queens, New York from 1977 to 1978 and the physician-in-charge from 1978 to 1981. I was also director of a joint training program of New York University-Booth Memorial Medical Center from 1977 to 1984 and I have served as an attending physician in the department of medicine at New York Hospital Medical Center in Queens.

I am also the Associate Director of the Eugene and Theresa Lang Center for Research and Education and Director of Endocrinology at the New York Hospital Medical Center of Queens, New York.  From 1987 to 2007, I was the Editor-in-Chief of the journal, *Practical Diabetology*.   I am also on the editorial board of *Diabetes Self Management*.  I have published more than 15 articles in peer-reviewed journals, and five chapters and 12 abstracts of papers, posters or presentations.  I have lectured widely to professionals on topics involving or related to diabetes. I have attached my current *curriculum vitae.*

As we discussed, my consulting fee for preparation of my report  is $150 per hour and for deposition and trial is $300 per hour.

At your request, I have reviewed the following documents concerning the above case:
- Defendant's response to plaintiff's first request for admissions
- Defendant's response to plaintiff's first set of nonuniform interrogatories
- Defendant's response to plaintiff's first request for production of documents
- Proposed case of management plan
- Second amended notice of 30(b)(6) deposition of Kalil Bottling Co.
- Defendant's initial disclosure statement.
- Letter from James M. Sakrison to EEOC dated 07/21/2005.
- Notice of charge of discrimination dated 02/23/2006.
- Hand written single sheet of lined paper.
- Pages two and three of discharge instructions from Flagstaff Medical Center dated 10/14/2005
- The patient referral note dated 01/26/2005.
- Note stating that the patient was seen on 01/12/2005
- Status change form dated 01/26/2005 and 02/02/2005.
- Job analysis undated.
- Letter dated 06/06/2005 to Mr. Nez from Carmanlitai Hodge-Green on EEOC letterhead.
- Medical examination report for Commercial Driver Fitness Determination dated 01/25/2005
- Medical examination report for Commercial Driver Fitness Determination dated 02/23/2005
- Medical records from Tuba City Regional Health Care Corporation for three hospitalizations with the following discharge dates:
  - 08/02/2003
  - 05/30/2005
  - 09/30/2005 including an operative note
- Note from Dr. Singh dated 01/03/2006 and further medical records from Dr. Singh.
- Authorization by Mr. Nez to allow his wife to represent him on the above named charge
- Authorization for use of a disclosure health information signed by Mr. Nez on 11/13/2005
- Letter from James M. Sakrison to John Irwig dated 09/14/2005
- Web page of rule 26 of the Federal Rules of Civil Procedure pertaining to expert testimony

My Summary and opinions are as follows:

Mr. Nez was being treated for type 2 diabetes.  In July of 2003, he was admitted to Tuba City Hospital for the right great toe ulcer and cellulitis.  The next medical record is the 01/26/2005 note from Dr. McGee. He is being treated with insulin and an oral hypoglycemic agent.  In May of 2004, he was hospitalized at Tuba City Hospital for congestive heart failure and in August of 2004 began working for Kalil Bottling Co.  He underwent two examinations following the guidelines of the Department of Transportation Commercial Drivers License medical evaluation.  At the time of the 01/25/2005 examination, he was noted to be on insulin twice a day in a dose of 15 units in the morning and 10 units in the evening.  At this time, the doctor stated "to pass in the future would need insulin waiver".  He underwent a second DOT exam on 02/23/2005.  When it was determined that he was still taking insulin, he was terminated from employment on 02/20/2005.

Mr. Nez went on to develop further complications of his diabetes.  At no time, however, was there any documentation of hypoglycemic episodes.

In 2006, I participated in an expert panel of consultants to the FMCSA Medical Review Board. Our task was to review and evaluate the relevant medical and federal literature that applies to commercial drivers with diabetes. In addition, we were to review and comment upon a report produced by ECRI for the FMCSA on the issues related to CMV drivers with diabetes.

As a member of the diabetes expert panel advising the FMCSA Medical Review Board on issues related to diabetes and Commercial Vehicle Driver Safety I have had the opportunity to review a number of issues related to diabetes and driving. A bibliography of relevant articles reviewed by the expert panel is appended to this report.

Our expert panel came to the following conclusions.

- There was no evidence for increased risk of crash in Commercial Motor Vehicle Drivers on insulin

- Accident risk in Commercial Motor Vehicle Drivers was repeatedly associated with age, miles driven, time of day or night and it is type of road driven.  There was no consistent pattern and no hypoglycemia with either insulin treatment, no hypoglycemia and motor vehicle accident

- In the type 2 diabetes population hypoglycemia is not likely to account for any increased risk of accidents and insisting on insulin use being an absolute contraindication to commercial driving is unscientific, inappropriate, and contrary to the weight of the medical literature.

My review of Mr. Nez's medical record reveals that Mr. Nez was substantially limited, compared to the average person in the population

- in  walking due to diabetic neuropathy and foot ulcers
- in eating and food choices due to diabetes
- in that he had to inject insulin under his skin twice a day

- in that he was required to undergo hemodialysis three times a week to cleanse his body of impurities
- in that he recurrent episodes of heart failure that limited his ability to breathe.

Furthermore, my review of Mr. Nez's records reveals no evidence that he would have any impairment of his ability to drive a truck.

Thus, using DOT restrictions for Mr. Nez was not medically indicated.

My opinion is based upon my review of the above listed materials and the appended bibliography.

 I, Daniel L. Lorber, certify and affirm that the forgoing is true to the best of my knowledge and under the penalty of perjury.


Respectfully,

Daniel L. Lorber, M.D., F.A.C.P., C.D.E.
Clinical Associate Professor of Medicine
Weill Medical College of Cornell University

# CURRICULUM VITAE

| | |
|---|---|
| NAME: | DANIEL L. LORBER, M.D., F.A.C.P., C.D.E. |
| DATE OF BIRTH: | September 21, 1946 |

**CURRENT POSITIONS:**

| 1986- | Medical Director, Diabetes Control Foundation, Diabetes Care & Information Center of New York, 59-45 161 Street Flushing, New York 11365 |
|---|---|
| 1991- | Director of Endocrinology, The New York Hospital Queens, Flushing, New York 11355 |
| 1994- | Clinical Associate Professor of Medicine Weill Medical College of Cornell University |
| 2008- | Associate Director, Lang Center for Research and Education New York Hospital Queens |

**EDUCATION:**

| 1968 | B.A., Columbia College |
|---|---|
| 1972 | M.D., Albert Einstein College of Medicine |

**POSTGRADUATE TRAINING:**

| 1972-73 | Internship in Medicine Bronx Municipal Hospital Center Albert Einstein College of Medicine Bronx, New York |
|---|---|
| 1973-75 | Residency in Medicine Bronx Municipal Hospital Center Albert Einstein College of Medicine |
| 1975-77 | Fellowship in Endocrinology Clinical Research Center Associate Physician Vanderbilt University Medical Center Nashville, Tennessee |

DANIEL EICHNER, MD PhD, CDE

## PRIOR ACADEMIC APPOINTMENTS:

| | |
|---|---|
| 1975-77 | Instructor, Department of Medicine<br>Vanderbilt University School of Medicine |
| 1977-84 | Assistant Dean,<br>Assistant Professor of Clinical Medicine<br>New York University School of Medicine and<br>Postgraduate Medical School |
| 1984-87 | Assistant Clinical Professor of Medicine<br>Albert Einstein College of Medicine |
| 1987-94 | Associate Clinical Professor of Medicine<br>Albert Einstein College of Medicine |

## PROFESSIONAL EMPLOYMENT
## AND HOSPITAL APPOINTMENTS:

| | |
|---|---|
| 1978-81 | Physician-in-Charge, Division of Endocrinology,<br>Booth Memorial Medical Center, Flushing, New York |
| 1977-84 | Director, USFMG Training Programs - Fifth Pathway,<br>New York University School of Medicine -<br>Booth Memorial Medical Center Affiliate |
| 1977-present | Attending, Department of Medicine<br>New York Hospital Queens |

## BOARD CERTIFICATION:

| | |
|---|---|
| 1975 | Diplomate of the American Board of Internal Medicine #49231 |
| 1977 | Diplomate of the ABIM in Endocrinology and Metabolism |
| 1991 | National Certification Board for Diabetes Educators<br>#0912-2296, Re-certified 2001 |

## LICENSURE:

| | |
|---|---|
| 1974 | New York State #119523 |

## PROFESSIONAL SOCIETY MEMBERSHIP:

| | |
|---|---|
| 1979 | New York State Society of Internal Medicine, ASIM |
| 1979 | Clinical Society, American Diabetes Association |
| 1980 | Endocrine Society |
| 1981 | Fellow, Clinical Society, New York Downstate Affiliate,<br>American Diabetes Association |
| 1981 | New York Academy of Sciences |

PROFESSIONAL SOCIETY MEMBERSHIP (cont):

| | |
|---|---|
| 1982 | American College of Physicians |
| 1985 | Fellow, American College of Physicians |
| 1994 | American College of Physician Executives |

EDITORIAL EXPERIENCE:

| | |
|---|---|
| 1986- | Editorial Board, Diabetes Self Management |
| 1987-2007 | Editor-in-Chief, Practical Diabetology |

OTHER PROFESSIONAL ACTIVITIES:

| | |
|---|---|
| 2008 | ADA Health Reform Task Force |
| 2006- | Diabetes Expert Panel<br>Federal Motor Carrier Safety Administration |
| 2004-7 | Member, Joint ADA-ACOEM committee to develop employment standards for peace officers with diabetes |
| 2004-6 | Member - Joint ADA-NFPA committee to revise employment standards for firefighters with diabetes |
| 2005 | ADA representative to the UHMS conference to develop guidelines for SCUBA diving with diabetes |
| 2004-7 | Board of Directors, American Diabetes Association |
| 2004- | Legal Advocacy Subcommittee, American Diabetes Association |
| 2002- | Board of Directors, National Commission on Correctional Health Care (NCCHC)<br>Chair, Joint ADA, NCCHC Working Group on Diabetes Guidelines for Correctional Institutions |
| 1999- | Member, Radiologic Technology Advisory Board to the Bureau of Environmental Radiation Protection, New York State Department of Health |
| 1998- | Member, Regional Community Assembly,<br>Eastern Region, American Diabetes Association (ADA) |
| 1998- 9 | Member, Government Relations Committee, ADA |
| 1995-8 | Member, Education Program Recognition Committee, ADA |
| 1992-4 | Chairman, Community Initiatives Committee,<br>New York Downstate Affiliate (NYDA), ADA |

OTHER PROFESSIONAL ACTIVITIES (cont):

| | |
|---|---|
| 1991-2 | Co-chairman, Patient Services Committee, New York City Chapter, ADA |
| 1991-5 | Co-chairman, Public Awareness Committee, Pregnancy Council, ADA |
| 1990- 5 | Member, Pregnancy Task Force Finance Coordinating Committee, Division of Diabetes Translation, Center for Disease Control |
| 1988-9 | Chairman, Membership Committee Chairman, Nominating Committee, Clinical Society, NYDA, ADA |
| 1987-8 | Chairman, Clinical Society Council, NYDA, ADA |
| 1986- | Medical Director, Diabetes Care and Information Center of New York, Flushing, N.Y. |
| 1983- | Board of Directors, Diabetes Control Foundation |
| 1982-94 | Board of Directors, NYDA, ADA |

ORIGINAL COMMUNICATIONS IN REVIEWED JOURNALS:

1: Lorber DL, Provenzano R, McClellan W.
 Prevalence and treatment of anemia with once-weekly epoetin alfa in patients with diabetes and
 chronic kidney disease. Endocr Pract. 2006 Sep-Oct;12(5):506-13.

2: Lorber D, Reddan D: Clinical characteristics of chronic kidney disease patients with and without
 diabetes: a subanalysis of the PAERI study.
 Clin Nephrol. 2006 Jul;66(1):11-6.

3: Brunton S, Carmichael B, Funnell M, Lorber D, Rakel R, Rubin R.
 Type 2 diabetes: the role of insulin. J Fam Pract. 2005 May;54(5):445-52.

4: McClellan W, Aronoff SL, Bolton WK, Hood S, Lorber DL, Tang KL, Tse TF,
 Wasserman B, Leiserowitz M.
 The prevalence of anemia in patients with chronic kidney disease.
 Curr Med Res Opin. 2004 Sep;20(9):1501-10.

5: Nicoleau A, Balzora JD, Chowdhury M, Saw D, Nussbaum M, Lorber D.
 Flatulence and carpopedal spasm: more than social embarrassment.
 QJM. 2004 Feb;97(2):105-6.

ORIGINAL COMMUNICATIONS IN REVIEWED JOURNALS(cont):

6: Lorber DL, Chavez S, Dorman J, Fisher LK, Guerken S, Haas LA, Hill JV,
   Kendall D, Puisis M, Salomone K, Shansky RM, Wakeen B; American Diabetes Association.
   Diabetes management in correctional institutions.
   Diabetes Care. 2004 Jan;27 Suppl 1:S114-21.

7: Lorber DL. Sliding scale insulin. Diabetes Care. 2001 Nov;24(11):2011-2.

8: Ferenczi A, Reddy K, Lorber DL. Effect of immediate hemoglobin A1c results on treatment
   decisions in office practice. Endocr Pract. 2001 Mar-Apr;7(2):85-8.

9: Colakovski H, Lorber DL. Propylthiouracil-induced perinuclear-staining antineutrophil
   cytoplasmic autoantibody-positive vasculitis in conjunction with pericarditis. Endocr Pract. 2001
   Jan-Feb;7(1):37-9.

10: Lorber D.  What works? The Diabetes Care and Information Center.
    Diabet Med. 1998;15 Suppl 4:S24-7.

11: Lu HC, Parikh PP, Lorber DL.
    Phenformin-associated lactic acidosis due to imported phenformin.
    Diabetes Care. 1996 Dec;19(12):1449-50.

12: Lorber D, Krim E.  Beta-sympathomimetic therapy of premature labor.
    Diabetes Care. 1996 Aug;19(8):899.

13: Lorber D. Nonketotic hypertonicity in diabetes mellitus.
    Med Clin North Am. 1995 Jan;79(1):39-52.

14: Tibaldi JM, Lorber D, Lomasky S, Steinberg JJ, Reisman R, Shamoon H.
    Postprandial hypoglycemia in islet beta cell hyperplasia with adenomatosis of the pancreas.
    J Surg Oncol. 1992 May;50(1):53-7.

15: Tibaldi JM, Lorber DL, Nerenberg A.
    Diabetic ketoacidosis and insulin resistance with subcutaneous terbutaline
    infusion: a case report. Am J Obstet Gynecol. 1990 Aug;163(2):509-10.

16: Danoff A, Jormark S, Lorber D, Fleischer N.
    Adrenocortical micronodular dysplasia, cardiac myxomas, lentigines, and spindle
    cell tumors. Report of a kindred. Arch Intern Med. 1987 Mar;147(3):443-8.

17: McLean GW, Rabin D, Moore L, Deftos LJ, Lorber D, McKenna TJ.
    Evaluation of provocative tests in suspected medullary carcinoma of the
    thyroid: heterogeneity of calcitonin responses to calcium and pentagastrin.
    Metabolism. 1984 Sep;33(9):790-6.

ORIGINAL COMMUNICATIONS IN REVIEWED JOURNALS(cont):

18: McNeil LW, McKee LC Jr, Lorber D, Rabin D.
    The endocrine manifestations of hemochromatosis.
    Am J Med Sci. 1983 May-Jun;285(3):7-13.


19: Linde R, Lindner J, Lorber D, Rabin D.
    Dissociation of LH and FSH Responses to LHRH during estrogen therapy of patients with
    ovarian failure. Horm Metab Res. 1982 Mar;14(3):154-6.


20: McKenna TJ, Lorber D, Lacroix A, Rabin D.
    Testicular activity in Cushing's disease.
    Acta Endocrinol (Copenh). 1979 Jul;91(3):501-10.


CHAPTERS:

1. Lorber, D., and Anastasio, P.: Integrating Nutrition and Medical Practice, in: Wassertheil-
   Smoller S, Alderman M, Wylie-Rosett J, Cardiovascular Health and Risk Management,
   PSG Publishing Co., Inc. 183-201,1989.

2. Lorber, DL:  Session #5, "Being the Best You Can Be", coping with Diabetes, in: Stay Well,
   NYC Dept. for the Aging, Nov. 1988.

3. Lorber, DL:  Neuropathy and the Diabetic Foot (Chap 4) in: Brenner MA (ed): Management of
   the Diabetic Foot, Baltimore, Williams and Wilkins, 1987, pp. 18-47.

4. Glossary for Gestational Diabetes: What To Expect, American Diabetes Association, Inc., 1989.

5. Lorber, DL:  Predischarge Planning (Chap 16) in: Bergman M, Sicard SA (eds):  Surgical
   Management of the Diabetic Patient, New York, Raven Press, Ltd, 1991, pp. 181-194.

6. Lorber, DL: Scuba Diving (Chap 37) in: Ruderman N, Devlin JT, Schneider SH, Kriska A (eds):
   Handbook Of Exercise In Diabetes, American Diabetes Association, Inc., 2002, pp. 639-648.

7. Lorber, DL: Legal Advocacy at the American Diabetes Association; in: Pollock NW, Uguccioni
   DM, Dear G de L, eds. Diabetes and recreational diving: guidelines for the future. Proceedings
of   the Undersea and Hyperbaric Medical Society/Divers Alert Network 2005 June 19 Workshop.
   Durham, NC: Divers Alert Network; 2005.

8. Lorber D, Macrovascular Disease in Diabetes (chap 21)  in: Mensing C, (ed): The Art
   and Science of Diabetes Self-Management Education, Chicago, American Association
   of  Diabetes Educators, 2006  pp. 475-510.

ABSTRACTS:

1. Lorber, D., McKenna, T.J and Rabin, D.:  Further abnormalities of steroidogenesis is hirsutism-anovulation syndromes. Endocrine Society Abstracts.  Endocrinology 98:517A, 1976.

2. Horton, E.S., Lorber, D., Jones, G.S., Engel, E. and Rabinowitz, D.:  The varied clinical expression of the XYY genotype.  Clin. Res. 24:478A, 1976.

3. Lorber, D.L., McKenna, T.J. and Rabinowitz, D:  Elucidation of abnormal steroidogenesis in hirsute anovulatory pateints.  Clin. Res. 25:14A, 1977.

4. Lorber, D.L., McKenna, T.J., Harrison, R.W. and Rabinowitz, D.: Abnormal hypothalamic-pituitary-testicular axis in patients with Cushing's disease.  Clin. Res., January, 1977.  Presented to American Society of Andrology, Palm Springs, March 15-19, 1977.

5. McKenna, T.J., McLean, G.W., Lorber, D.L., Bone,H.G. and Parthemore, J.G.:  Comparison of calcitonin stimulation tests used in screening for medullary carcinoma of the thyroid (MCT). Endocrinology 102:590A, 1978.

6. McKenna, T.J., Lorber, D.L., Parthemore, J.G., Bone, H.G. and Deftos, L.:  Comparison of tests of calcitonin (CT) secretion in screening for medullary carcinoma of the thyroid (MCT). Submitted to Clin. Res. 1978.

7. McKee, L.C., Jr., Lorber, D. and Rabinowitz, D.:  The spectrum of pituitary disease in hemochromatosis.  Presented at the Pacific Congress of Hematology, 1978.

8. Alling, K, Lorber, DL.:  Teaching Analysis of Blood Glucose Patterns to Home Monitoring Patients.  Diabetes, Vol.31 (suppl.2):106A,1982.

9. Lorber, D., Jornsay, D., Anastasio, P., Tibaldi, J.:  An Outpatient Multidisciplinary Health Care Team for Gestational Diabetes Management. Diabetes, Vol. 36 (suppl.1):144A,1987.

10. Cregin RC, Lorber DL, Goldberg MD, Brody, PA: Eliminating Sliding Scale Through Computerized Insulin Order Entry. Submitted to ADA Scientific Sessions 2008.

11. Onat D, Bucciarelli L, Egan T, Donovan DS, Lorber D, Akman HO, Manzoor K, Jelic S, Schmidt AM, Colombo PC: Quantification of Endothelial Activation in Type 1 Diabetic Patients by a Novel Methodology: Endothelial Sampling Coupled with Real-Time PCR Analysis. Submitted to ADA Scientific Sessions 2008.

ABSTRACTS: Paper Presentations

1. Lorber, D.:  Inadequate Screening for Complications in Diabetes Centers.  American Diabetes Association, Atlanta GA., 1990.

ABSTRACTS: Poster Presentations

1. Lorber, D.:  Inadequate Screening for Complications in Diabetes Centers.  International Diabetes Federation, Poster Session, Washington D.C., 1991.

2. Reddy, K., Ferenczi, A., Lorber, D.: Impact of Immediate HbA1c Results on Treatment Decisions in Office Practice.  59th Scientific Sessions, American Diabetes Association, San Diego CA, 1999.

3. Provenzano R, Lorber D, McClellan W: Prevalence of Anemia in Diabetic Patients with Chronic Kidney Disease and Treatment with Epoetin Alfa Once Weekly. NKF Clinical Nephrology Meetings, Chicago, IL 2002.

4. Lorber D, Reddan D: Observed Clinical Differences in Diabetic and Nondiabetic Patients with Chronic Kidney Disease (CKD): Subanalysis of the PAERI Study. 64th Scientific Sessions, American Diabetes Association, Orlando, FL, 2004.


OTHER:

1985 - present

> Articles, Question & Answer Column, Commentary for <u>Practical</u> <u>Diabetology</u>, <u>Clinical Diabetes</u>, <u>Diabetes in The News</u>, and <u>Diabetes</u> <u>Self-Management, DOC News</u>.

> Extensive lecturing to patient and professional groups on topics related to diabetes. Consultant in Medical, Dental and Podiatric Liability Litigation.

> Consultant to Insurance Industry on Care Standards for Diabetes Mellitus.

> Consultant for Diabetes Anti-discrimination cases.

EEOC v KALIL

BIBLIOGRAPHY

Daniel Lorber, MD, FACP, CDE

September 15, 2008

1.  Donnelly LA, Morris AD, Frier BM, Ellis JD, Donnan PT, Durrant R, Band MM, Reekie G, Leese GP. Frequency and predictors of hypoglycaemia in Type 1 and insulin-treated Type 2 diabetes: a population based study. Diabetes Med 2005 Jun;22(6):749-55.

2.  MacLeod KM, Hepburn DA, Frier BM. Frequency and morbidity of severe hypoglycaemia in insulin-treated diabetic patients. Diabetes Med 1993 Apr;10(3): 238-45.

3.  Casparie AF, Elving LD. Severe hypoglycemia in diabetic patients: frequency, causes, prevention. Diabetes Care 1985 Mar-Apr;8(2): 141-5.

4.  Cox DJ, Penberthy JK, Zrebiec J, Weinger K, Aikens JE, Frier B, Steson B, DeGroot M, Trief P, Schaechinger H, Hermanns N, Gonder-Fredrick L, Clarke W. Diabetes and driving mishaps: frequency and correlations from a multinational survery. Diabetes Care 2003 Aug;26(8): 2329-34.

5.  Stevens AB, Roberts M, McKane R, Atkinson AB, Bell PM, Hayes JR. Motor vehicle driving among diabetics taking insulin and non-diabetics. Br  Med J (Clin Res Ed) 1989 Sep2;299(6699): 591-5

6.  Hepburn DA, Deary IJ, Frier BM. Classification of symptoms of hypoglycaemia in insulin-treated diabetic patients using factor analysis: relationship to hypoglycaemia unawareness. Diabetes Med 1992;9(1):70-5

7.  Qualifying individuals with insulin-trated diabetes to operate commercial motor vehicles. [FMCSA-MCRT-020001]. Washington (DC): Federal Motor Carrier Safety Administration; 2001 Nov 1. 4 p.

8.  Whitehouse F.  Conference on diabetic disorders and commercial drivers [Pub No. FHWA-MC-88-041]. Washington (DC): Federal Highway Administration, Office of Motor Carriers; 1988 Jul. 66 p. Also available: http://www.fmcsa.dot.gov/documents.diabetic.pdf

9.  LaPorte RE, Songer TJ, Gower IF, Lave LB, Ekoe JM. Insulin-treated commercial motor vehicle drivers [FHWA-MC-02-012]. Washington (DC): Federal Highway Administration, Office of Motor Carriers; 2001 May.106 p.

10. Laberge-Nadeau C, Dionne G, Ekoe JM, Harnet P, Desjardins D, Messier S, Maag U. Impact of diabetes on crash risks of truck-permit holders and commercial drivers. Diabetes Care 2000 May;23(5):612-7.

11. Koepsell TD, Wolf ME, McCloskey L, Buchner DM, Louie D, Wagner EH, Thompson RS. Medical conditions and motor vehicle collision injuries in older adults. J Am Geriatr Soc 1994 Jul;42(7):695-700.

12. Hansotia P, Broste SK. The effect of epilepsy or diabetes mellitus on the risk of automobile accidents. N Engl J Med 1991 Jan 3;324(1);22-6.

13. Davis TG, Wehling EH, Carpenter RL. Oklahoma's medically restricted drivers. A study of selected medical conditions. J Okla State Med Assoc 1973Jul;66(7):322-7.

14. Ysander L. Diabetic motor-vehicle drivers without driving-license restrictions. Acta Chir Scand Suppl 1970;409:45-53.

15. Campbell EO, Ellis KG. Chronic medical conditions and traffic violation and accident  experience of diabetic drivers. Mod Med Can 1969 Nov 1;24(11):29-31

16. McMurray L, Crancer A Jr. Accident and violation rates of Washington's medically restricted drivers. JAMA 1968;205:272-6.

17. Ysander L. The safety of drivers with chronic disease. Br J Ind Med 1966 Jan;23(1):28-36

18. Waller JA. Chronic medical conditions and traffic safety: review of the California experience. N Engl J Med 1965 Dec 23;273(26):1413-20.

19. U.K. Prospective Diabetes Study (UKPDS) Group. Intensive blood-glucose control with sulphonylureas or insulin compared with conventional treatment and risk of complications in patients with Type 2 diabetes (UKPDS 33). Lancet 1998 Sep 12;352(9131):837-53.

20. Murata GH, Duckworth WC, Shah JH, Wendel CS, Mohler  MJ, Hoffman RM. Hypoglycemia in stable, insulin-treated veterans with type 2 diabetes: a prospective study of 1662 episodes. J Diabetes Complications 2005 Jan-Feb;19(1):10-7

21. Harsch IA, Stocker S, Radespiel-Troger M, Hahn EG, Konturek PC, Ficker JH, Lohmann T. Traffic hypoglycaemias and accidents in patients with diabetes mellitus treated with different antidiabetic regimens. J Intern Med 2002 Oct;252(4):352-60.

22. Kennedy RL, Henry J, Chapman AJ, Nayar  R, Grant P, Morris AD. Accidents in patients with insulin-treated diabetes: increased risk of low-impact falls but not motor vehicle crashes—a prospective register-based study. J Trauma 2002 Apr;52(4):660-6.

23. Gislason T, Tomasson K, Reynisdottir H, Bjornsson JK, Kristbjarnarson H. Medical risk factors amongst drivers in single-car accidents. J Intern Med 1997 Mar;241(3):213-9

24. Sagberg F. Driver health and crash involvement: a case-control study. Accid Anal Prev 2006 Jan;38(1):28-34

25. Mathiesen B, Borch-Johnsen K. Diabetes and accident insurance. A 3-year follow-up of 7,599 insured diabetic individuals. Diabetes Care 1997 Nov;20(11):1781-4

26.  Canfield DV, Chaturvedi AK, Boren HK, Veronneau SJ, White VL. Abnormal glucose levels found in transportation accidents. Washington (DC): Federal Avaition Administration, Office of Aviation Medicine; 2000 Jun 1. 11 p.
Also Available: http://ntl.bts.gov/lib/17000/17600/17672/PB2001102917.pdf

27. Dionne G, Desjardins D, Laberge-Nadeau C, Maag U. Medical conditions, risk exposure, and truck drivers' accidents: an analysis with count data regression models.
Accid Anal Prev 1995 Jun;27(3):295-305.

28. Allen KV, McAulay V, Sommerfield AJ, Frier BM. Hypoglycaemia is uncommon with a combination of antidiabetic drugs and bedtime NPH Insulin for type 2 diabetes. Pract Diabetes Int 2004;21(5):179-82.

# EXHIBIT 21

1

1

2           IN THE UNITED STATES DISTRICT COURT

3               FOR THE DISTRICT OF ARIZONA

4

5   EQUAL EMPLOYMENT OPPORTUNITY  )
    COMMISSION,                   )
6                                 )
              Plaintiff,          )
7                                 )
         v.                       ) No. CIV 07-488-TUC-BPV
8                                 )
    KALIL BOTTLING CO.,           )
9                                 )
              Defendant.          )
10  _____)

11

12

13

14            DEPOSITION OF JOHN M. CAUSBIE
                   September 3, 2008
15                 Tucson, Arizona

16

17

18

19               Colville & Associates
                   1309 E. Broadway
20               Tucson, AZ 85719-5824
                    (520) 884-9041
21               FAX (520) 623-1681

22           Reported by: Doug Kirkpatrick
             Certified Reporter No. 50705
23

24

25

1        A.   Oh, yeah.

2        Q.   So the automobile --

3        A.   We used to write the auto insurance -- I

4    think when I -- now, I didn't write this -- all these

5    years I haven't written it.  In some years I've

6    written, some years I haven't written.  I've written

7    everything since 1994.

8        Q.   Okay.

9        A.   Prior to that sometimes I wrote it and

10   sometimes I didn't, but I've been involved in the

11   account.

12       Q.   Okay.

13       A.   Yeah, huge increases.

14       Q.   Okay.  As a -- both as a raw number and as

15   a proportion?

16       A.   Well, pricing is driven -- when I started

17   working on the account, their pricing was terrible

18   because of their loss history in -- in 1974, I

19   guess -- and this is one of the reasons I talked to

20   Bill Ourand because we were trying to recall when we

21   got tough -- but they had a lot of accidents caused

22   by both mechanical failures and poor driving records.

23       Q.   Okay.

24       A.   And so after the --

25       Q.   And you think this was in what year?

```
 1          A.    I think it was about 1974 we had a bad

 2    year, very bad year.   They were probably written at

 3    that time at about a hundred fifty percent of manual

 4    premium.   I'm just guessing this now, but roughly a

 5    hundred fifty to -- substantially higher than the

 6    normal premium.

 7          Q.    Okay.

 8          A.    On the basis of what they're paying for

 9    auto insurance, it would be a lot of money today.

10          Q.    So they had a lot of accidents and they

11    were paying more in insurance?

12          A.    Oh, yes.

13          Q.    And the accidents were mechanical failures,

14    which means their vehicles --

15          A.    And poor driving records, which were

16    liability claims.

17          Q.    But the mechanical failures were like --

18          A.    I'll explain that -- were just mechanical

19    failures.   Equipment broke down.

20                So in 1975, Kalil instituted a program of

21    religious mechanical corrections.   They hired Ruan

22    and they serviced their vehicles religiously.   I

23    mean, religiously.   Anytime a vehicle needed to be

24    serviced, they would pull it out of service and they

25    would get a leased vehicle from Ruan to replace it.
```

1       Q.    Ruan is -- how do you spell that?

2       A.    R-a-u-n, I think.

3       Q.    What are they?  Like a --

4       A.    They were a truck leasing and service

5    company.

6       Q.    Okay.

7       A.    They actually set up a shop in Tucson to

8    handle the Kalil fleet.

9       Q.    Okay.

10      A.    At the same time we went into the driving

11   records, and this is when we really toughened up the

12   driving records.

13      Q.    Okay.

14      A.    And as I recall -- now, again, I'm not sure

15   this is perfect, but I think -- my best recollection

16   is that if they had any moving violations in two

17   years, they could not be hired as a driver.

18      Q.    And that started in 1975?

19      A.    Yes.

20      Q.    Okay.

21      A.    And we also required the -- at that time,

22   it was before the commercial driver's license, but we

23   still required the physical, the high level physical

24   to drive a company vehicle.

25      Q.    Okay.  Anything else to just the driving

1    record?

2         A.   Well, they did a normal application,

3    checking references and things like that.

4         Q.   Did they change that at all in 19- --

5         A.   No, we really haven't changed that since

6    1975.

7         Q.   But did they change -- is that something

8    that changed in 1974?

9         A.   Oh, yes.

10        Q.   So the application process changed?

11        A.   Well, we started looking pretty hard at the

12   drivers.

13        Q.   You would ask for driver history and stuff?

14        A.   Oh, yes.

15        Q.   And by -- I mean Kalil would ask for

16   driving history?

17        A.   Yes.  I didn't.  But what I did is I

18   hammered Kalil and I reminded them how much they were

19   paying for insurance and how much it was going to

20   cost them in the future, and so they agreed that they

21   needed to do something with it.

22        Q.   Okay.  Now, the application -- okay.  So

23   you started to look at the driving records, and they

24   had this policy with respect to --

25        A.   Oh, yeah.

1      Q.   Two years you said or --

2      A.   I think two years of no tickets.

3      Q.   Okay.

4      A.   That's my best recollection.

5           Now, also, if they had any kind of at-fault

6      accidents, they weren't going to be hired at all.

7      Q.   And that was new also?

8      A.   That was also new in '75.

9      Q.   Okay.  One thing that we've looked at -- I

10     guess I could show it to you, I know that you

11     probably have not seen this -- but there's a policy

12     that -- if I can show you Deposition Exhibit Number

13     6.

14          Have you ever seen any of the Kalil

15     policies or --

16     A.   No.

17     Q.   That policy requires like an annual review

18     of the driving history?

19     A.   Oh, yes.

20     Q.   Is that something that started in 1975?

21     A.   No, I don't think it started in '75, but it

22     started probably shortly thereafter.  We started

23     checking MVRs.

24     Q.   So before 1975 they did not check --

25     A.   Not regularly.  They might have checked

22

1    them irregularly, but they didn't check them

2    regularly.

3        Q.   They didn't regularly check the driving

4    history, correct?

5        A.   Yes.

6        Q.   They didn't --

7        A.   To my knowledge.

8        Q.   They didn't have this two-year rule about

9    violations?

10       A.   Yeah.

11       Q.   They didn't have this rule about at-fault

12   accidents?

13       A.   Well, it sometimes might -- if they really

14   had a bad one it might come up, but they didn't have

15   a hard, rigid rule, no.

16       Q.   And they didn't have the DOT physical

17   requirement?

18       A.   No.

19       Q.   And they didn't do the same -- put the same

20   effort into servicing the vehicles?

21       A.   Not at all.

22       Q.   Okay.  Now, you said that somebody looked

23   at the accidents at this time?  You did?

24       A.   Oh, yes.

25       Q.   So what did you look at physically?  I

1      Q.    Okay.  You're just going on your memory

2   now?

3      A.    Yeah.

4      Q.    Okay.  So then you went to Kalil and you

5   said look, if you do these things, I can probably get

6   you a lower price?

7      A.    Yes.

8      Q.    Okay.  But none of the insurance companies

9   told you to do that, right?

10      A.    No.

11      Q.    The insurance companies didn't say hey, you

12   know, they need to adopt a DOT physical requirement;

13   right?

14      A.    No.

15      Q.    In fact, that's not something you've ever

16   heard an insurance company say; right?

17      A.    No, not directly.

18      Q.    Okay.

19      A.    Not as a direct requirement to get

20   insurance necessarily; it's one of many factors that

21   you use to sell the insurance company.

22      Q.    It's one of the many factors, okay.

23            Who were you dealing with at Kalil at this

24   time?

25      A.    Bill Ourand.

1       Q.   Anybody else?

2       A.   No, principally Bill.

3       Q.   And you and Bill have discussed -- tried to

4    get together in terms of --

5       A.   Try to get him on the phone.

6       Q.   All right.  Now, before these changes, was

7    there even a -- was there a problem finding an

8    insurance company for Kalil?

9       A.   At that time, I would say no.

10      Q.   Okay.  It was just the cost that was a

11   problem?

12      A.   It was just cost.

13      Q.   Now, let me -- this is a little bit of a

14   digression.  Do you also do individual policies?

15      A.   Yes.

16      Q.   Okay.

17      A.   I don't handle them directly, but I --

18   yeah, I place them.  I can place them in our agency.

19      Q.   But you have handled them?

20      A.   Oh, yes.

21      Q.   And it's not typical for a private

22   insurance company to ask whether somebody has

23   diabetes, is it, before giving them an auto insurance

24   policy?

25      A.   I can't really tell you that because I

1    don't deal in the underwriting of personal lines

2    currently.

3         Q.   Okay.

4         A.   In the commercial area -- in the personal

5    area they look at a lot of different things and I'm

6    not sure what they use anymore.

7         Q.   Okay.

8         A.   Basically look at your past driving history

9    and financial records.  But as far as what they --

10   you know, there's -- and each company you deal with

11   has different underwriting rules, so you have big

12   variations between those.

13        Q.   Now, insurance companies have these

14   statisticians and mathematicians, right, that are

15   constantly running numbers; right?

16        A.   Actuaries.

17        Q.   The actuaries.  Have you seen any -- do you

18   review actuarial studies?  Are you familiar with the

19   actuarial studies or you just go by what they tell

20   you?  Is that --

21        A.   No, not directly.  I'm familiar with

22   actuaries' work.

23        Q.   Okay.

24        A.   My daughter is an actuary.

25        Q.   Okay.

1    A.   So I know how they work.  But actually I --

2    I actually do what actuaries do for Kalil.

3    Q.   What is that?

4    A.   Sit down and predict what the rates are

5    going to be.  I constantly talk to them and we look

6    at what -- I sit down and tell them what -- if

7    they're going to have a big increase in rates or if

8    rates will go down.  We talk about rates all the

9    time.

10    Q.   So after these changes in '74, '75 that

11    Kalil adopted, were you able to get them a better

12    rate?

13    A.   Oh, yes.

14    Q.   Okay.  How much did you save them, could

15    you estimate?

16    A.   I don't -- I couldn't tell you in '74.

17    Currently I can tell you.

18    Q.   Okay.  And you believe you got them a

19    better rate based on all of the changes that Kalil

20    made, right?

21    A.   Yes.

22    Q.   It wasn't any one specific change?

23    A.   No.

24    Q.   You can't stay I got them a better rate

25    just because they adopted the DOT physical?

 1      A.   No.

 2      Q.   No?  Okay.  I mean, servicing a vehicle is

 3   pretty basic to safety, right?

 4      A.   Oh, yeah.  That's -- that would be a

 5   standard that you should not have any kind of

 6   mechanical accidents.

 7      Q.   Now, you understand that there's certain

 8   positions at Kalil, certain driving positions where

 9   the employee drives their own vehicle; right?

10      A.   Yes.

11      Q.   Merchandisers?

12      A.   Yes.

13      Q.   Okay.

14      A.   Some cases.  Most cases they drive a

15   company vehicle.

16      Q.   But there are some merchandisers who drive

17   their own vehicle?

18      A.   Yes.

19      Q.   And these merchandisers, is it your

20   understanding that they're required to have their own

21   private insurance?

22      A.   Yes.

23      Q.   Okay.

24      A.   But you understand -- I might point out

25   here that you understand that Kalil is also a

1   premiums based on what they need to write the

2   account.

3        Q.   Okay.  So when you looked at the claims

4   back in '73, '74, '75, and evaluated what was causing

5   the accidents, do you remember any particular issue

6   with nonowned vehicle accidents?

7        A.   No.

8        Q.   Do you remember any specific claims for

9   nonowned vehicle claims?

10       A.   No.

11       Q.   Now, do you understand that the DOT policy

12  doesn't specifically apply to certain vehicles that

13  are under a certain weight?

14       A.   Yes.

15       Q.   Do you recall who -- are you the one who

16  first suggested the DOT policy?

17       A.   I don't remember.  I don't recall.

18       Q.   But you recall it was discussed back at

19  that time '73, '74?

20       A.   Yes.

21       Q.   Now, just with respect to the DOT physical

22  policy, had you ever been told by an insurance

23  company that if the company adopted the DOT physical

24  policy, that the rates would be lower?

25       A.   No, where it came up is we used it as a

40

1    sales advantage to get our rates lower.

2        Q.   Okay.

3        A.   That was one of the things we covered.

4        Q.   Okay.  But it was initiated by you and not

5    the insurance company?

6        A.   Yes.

7        Q.   It was part of like a marketing --

8        A.   Sales pitch, yes.

9        Q.   Sales pitch, okay.

10       A.   We were selling Kalil.

11       Q.   Did any insurance company indicate that

12   they felt that that was a compelling sales pitch?

13       A.   It was influential, yes.

14       Q.   Were you told that by anybody who insured

15   Kalil?

16       A.   Yes.

17       Q.   Who told you that?

18       A.   Travelers told me that.

19       Q.   And that's with the current policy?

20       A.   Yes.

21       Q.   And who did you deal with at Travelers who

22   mentioned that?

23       A.   Dave Brenton.

24       Q.   Dave Brenton?

25       A.   Uh-huh.

41

1          Q.    And what do you recall him saying?

2          A.    He was very impressed.

3          Q.    And you're talking about the DOT physical?

4          A.    No, I'm talking about -- it was one of

5     several things that we talked about, but yes, that

6     was something that he thought was good.

7          Q.    So Mr. Brenton mentioned the DOT physical

8     specifically?

9          A.    Yeah, we talked about the physicals.

10         Q.    Okay.  But when you said he was impressed,

11    you're talking about the whole safety --

12         A.    It was part -- yeah, it was part of the

13    whole program that we had installed at Kalil.

14         Q.    Okay.

15         A.    It's not that one thing that was -- you

16    know, there was no one thing that was, you know,

17    overwhelming, but it was a whole bunch of things that

18    we put together that was very impressive.

19         Q.    Okay.  Are you aware of any actuarial

20    studies which show that applying the DOT policy --

21    DOT physical standards to non-DOT regulated vehicles

22    actually reduces accidents?

23         A.    No.

24         Q.    You've never seen anything like that, any

25    study?

42

 1       A.   No.

 2       Q.   It was just a sales pitch, speculation;

 3  right?

 4       A.   Well, no.  What we did is we took a hard

 5  look at what kind of requirements we needed for

 6  driving.

 7       Q.   Uh-huh.

 8       A.   And we set up a pretty tough standard which

 9  has proved to be absolutely wonderful.

10       Q.   Okay.  Now, you indicated that you don't

11  recall any accidents involving diabetics, correct?

12       A.   No.

13       Q.   DOT physical qualification standards also

14  deal with hearing, correct?

15       A.   Yes.

16       Q.   They deal with epilepsy?

17       A.   Yes.

18       Q.   And they deal with vision?

19       A.   Yes.

20       Q.   When you did your review in '73, '74, do

21  you recall any accidents involving any of those other

22  impairments?

23       A.   No.

24       Q.   Okay.

25       A.   But I wouldn't know that probably unless it

# EXHIBIT 22

1

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ARIZONA

3                 *    *    *    *    *

4     EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

5                        vs.

6    KALIL BOTTLING CO., an Arizona corporation, Defendant.

7             Case No. CIV 07-488-TUC-BPV

8    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

9

10            DEPOSITION OF THOMAS KIMBRO

11             28th day of October, 2008

12                  Tucson, Arizona

13    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

14

15

16

17

18

19

20

21              COLVILLE & ASSOCIATES LLC

22          REPORTED BY:  G. ALLEN SONNTAG,
23           Certified Reporter No. 50194
              Colville File No. 45716
24

25

1          MS. KANON-USTARIZ:  Are you asking annually

2    or over the course of --

3          MR. LOPEZ:  Yes, over the course of their

4    employment.

5          THE WITNESS:  Yes, it was over the course.

6     BY MS. CHEN:

7     Q     And are merchandisers required to become

8    drivers over the course of their employment?

9     A     No, they are not required.

10     Q     To become a driver from a merchandiser, is

11    that a promotion?

12     A     Yes.

13     Q     Okay.  And does a merchandiser need to

14    affirmatively apply for the driver position or is it

15    sometimes just offered to them?

16     A     They -- what they do is they say that they

17    are interested in a driver's position.  At that point

18    they talk to the driving supervisor and, you know,

19    they kind of go to the top of the list.

20     Q     Okay.  If someone who is a merchandiser never

21    expresses interest in becoming a driver, would that

22    person likely be offered a position as a driver?

23     A     No.

24     Q     Okay.  Have you ever known anyone who worked

25    as a merchandiser who never expressed any interest to

# EXHIBIT 23

1 James M. Sakrison, Esq.
Diana L. Kanon-Ustariz
2 SLUTES, SAKRISON & ROGERS, P.C.
4801 E. Broadway, Suite 301
3 Tucson, AZ 85701
(520) 624-6691
4 State Bar No. 001948/021854
jsakrison@sluteslaw.com
5 dkanon@sluteslaw.com

6 Attorneys for Defendant Kalil Bottling Co.

7

8 **UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**
9

10 EQUAL EMPLOYMENT                    | **Case No.    4:07-cv-488-TUC-BPV**
OPPORTUNITY COMNMISSION,

11        Plaintiff,                          **DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S FIRST REQUEST FOR**
12 v.                                          **PRODUCTION OF DOCUMENTS**

KALIL BOTTLING CO., an Arizona
13 corporation,

14        Defendant

15

16        Defendant Kalil Bottling Co. ("KBC"), by undersigned counsel and pursuant to

17 Rules 26 and 34 of the Federal Rules of Civil Procedure, hereby submits its responses to the

18 Plaintiff's First Request for Production of Documents:
19

20                    **REQUESTS FOR PRODUCTION**

21

22        1.    Any and all documents relied upon by Defendant in answering any

23 interrogatory in Plaintiff's First Set of Interrogatories.

24        *All documents relied upon were disclosed to Plaintiff with Defendant's Initial*

25 *Disclosure Statement.*

26

-1-

2.     Any and all documents relating to, or supporting, each denial or partial denial set forth in Defendant's Answer.

*Those documents include any attached to Defendant's Initial Disclosure Statement and the documents attached hereto.*

3.     Any and all documents relating to, or supporting, each defense set forth in Defendant's Answer.

*See Answer to RFP #2.*

4.     Any and all documents, including but not limited to, statements, affidavits or declarations, made by any person relating to the allegations in the Commissions Complaint, Defendant's denials, or Defendant's defenses.

*Statement written by Robert Nagore, dated 12 June 2008 (attached)*

5.     Any and all documents that relate to your claims in any way, but that you may not use to support your claims, including any documents used solely for impeachment purposes.

*Defendant is not in possession of any such documents.*

6.     Entire copy of personnel file for Gerald Nez, including but not limited to, employment application, termination papers, performance reviews, promotional information, job responsibilities and disciplinary documents.

*Previously disclosed, save for certain medical reports, which are attached hereto (see response to #11).*

7.     Any and all documents showing training provided to Defendant's employees regarding the Americans with Disabilities Act at any time from January 1, 2002 to present.

*Equal Employment Opportunity and Affirmative Action Policy (attached)*

8.     All documents showing the type and value of any compensation or benefits paid to Gerald Nez, including health insurance, life insurance, and 401(k) plans.

- *Payroll Test Gross History re Gerald Y. Nez (attached)*

- *Time Card Report re Gerald Nez (attached)*

10. (sic)     All employee handbooks, associate reference guides and other personnel guidelines, rules or procedures applicable to Kalil in effect at any time from January 1, 2002 to the present.

- *Notice to Drivers and Merchandisers re Appearance (attached)*

- *Notice to All Operators of Company Vehicles (attached)*

- *Injury, Accident and Incident Policy (attached)*

- *Time Card Policy (attached)*

- *Policy Notice re "Drug-Free Workplace Act of 1988" (attached)*

- *Equal Employment Opportunity and Affirmative Action Policy (attached)*

- *Drug & Alcohol Testing and Physicals (attached)*

11.     Any and all documents relating to any medical records kept by Defendant regarding Gerald Nez.

- *Physical Exam Results from Concentra Medical Centers, dated 8/26/04 (attached)*

- *Concentra Medical Centers HPE Result Form dated 8/27/04 (attached)*

- *Pre-Placement / Return to Work Human Performance Evaluation Form dated 8/27/04 (attached)*

- *Concentra Medical Centers Medical Examination Report for Commercial Driver Fitness Determination, dated 1/25/05 (attached)*

- *Arizona Department of Transportation Motor Vehicle Division D.O.T. Medical Examination Report dated 2/23/05, including Medical Examiner Certificate (attached)*

13. (sic)     All documents in your possession relating in any manner to EEOC Charge No. 350-2005-02442.

*All such documents have either been disclosed with the Initial Disclosure Statement or are attached hereto.  The following documents are being withheld under a claim of attorney/client privilege and Kalil objects to their disclosure:*

- *Letter from J. Sakrison to George Kalil, dated 7/24/06*

- *Letter from J. Sakrison to Jeff Hill, dated 6/26/06*

- *Facsimile from J. Sakrison to George Kalil, dated May 11, 2006*

- *Facsimile from Jeff Hill to J. Sakrison, dated 5/4/06*

- *Facsimile from Jeff Hill to J. Sakrison, dated 9/22/05*

- *Facsimile from J. Sakrison to Jeff Hill, dated 9/22/05*

- *Facsimile from Jeff Hill to J. Sakrison, dated 9/9/05*

- *Facsimile from Jeff Hill to J. Sakrison, dated 9/1/05*

- *Facsimile from Jeff Hill to J. Sakrison, dated 7/11/05*

- *Letter from Jeff Hill to J. Sakrison, dated 7/5/05*

- *Facsimile from Jeff Hill to J. Sakrison, dated 7/5/05*

14.    All materials produced as a result of any internal investigation conducted by Defendant regarding discrimination on the basis of disability, including Gerald Nez's allegations.    This includes:    interview notes of all witness interviews conducted, tape recordings of all witnesses interviewed; any and all documentation reflecting investigative activities and findings; and a description of each disciplinary and/or remedial action taken as a result of each complaint including copies and records of all such disciplinary and/or remedial action.

*No internal investigations were conducted by Defendant and upon information and belief, no witnesses were interviewed.  Kalil has previously disclosed any and all documents generated between Plaintiff and Defendant during conciliation efforts, save for such documents that were withheld pursuant to the attorney / client privilege (see response to #13 above for privilege log).*

15.    Any and all materials used or produced in connection with any employee trainings pertaining to the subject of discrimination on the basis of disability, Defendant's procedures, if any, for reporting discrimination, or EEOC policies in effect at any time from January 1, 2002 to the present.  The request includes, but is not limited to, syllabi, hand-outs, hypotheticals and sign-in sheets.

*Equal Employment Opportunity and Affirmative Action Policy (attached)*

16.    All organizational charts applicable to Kalil's corporate, human resources or Flagstaff area operations in effect at any time from January 1, 2002 to the present.

*Upon information and belief, Kalil is not in possession of any such charts.*

17.    All documents showing the number of persons employed by Kalil for each year from 2002 to the present.

*Kalil Active Employees by Year 31-Dec-02 thru 31-Dec-07 (attached)*

18.    All policies between Kalil and any insurance company relating to any liability coverage of its employees, including Merchandisers.

*Search for documents is ongoing.  Will supplement.*

19.    All documents communicating to Merchandisers or any Kalil employee any requirement that employee pass the DOT physical or satisfy physical requirements and/or obtain a commercial driver's license.

*Drug & Alcohol Testing and Physicals Policy (attached)*

20.    All documents or records of accidents giving rise to any policy requiring any employee with driving responsibilities to pass a DOT physical or obtain a commercial driver's license.

*Objection.   Overly broad, unduly burdensome and not calculated to lead to the discovery of admissible evidence.  Kalil's policy goes back thirty years.  The request is not reasonably limited in geographic or temporal scope.*

21.    All job analyses for the Merchandiser Position.

*Job Analysis for Full Time Merchandiser (out of town) (attached)*

22.    All records showing the weight of any vehicles used by Merchandisers in the Flagstaff area at any time from January 1, 2002 to the present.

*Upon information and belief, no such records are maintained by Kalil.*

23.     All documents relating to any Kalil requirement that its employees satisfy United States Department of Transportation physical qualifications standards or obtain a commercial driver's license.

### Drug & Alcohol Testing and Physicals Policy (attached)

24.     All documents, such as job analyses or validity studies, showing any correlation between DOT physical requirements and the essential function of any driving position, including Merchandiser.

### Upon information and belief, no such documents are maintained by Kalil.

25.     All documents relating to any effort made by Kalil to determine the operating characteristics, including weight, of any vehicle used by Gerald Nez during the course and scope of his employment with Kalil.

### Upon information and belief, no such documents are maintained by Kalil.

26.     All documents showing the operating characteristics, including weight, of any vehicles used by Merchandisers during the period of Gerald Nez's employment.

### Upon information and belief, no such documents are maintained by Kalil.

27.     Any communications with any person contacted or retained by Defendant to provide expert services in this case.

### Although Defendant anticipates hiring an expert(s), no one has been contacted or retained at this time.

/ / /

/ / /

/ / /

-7-

1       DATED this 1st day of July, 2008.

2                         **SLUTES, SAKRISON & ROGERS, P.C.**

3

4

5                         James M. Sakrison
                        ~~Diana L~~.Kanon-Ustariz

6                         Attorneys for Defendant

7 **COPY** of the foregoing mailed this

8 1st day of July, 2008, to:

9 Mary Jo O'Neill
  Sally C. Shanley

10 P. David Lopez
  Equal Employment Opportunity Commission

11 3300 N. Central Avenue, Suite 690

12 Phoenix, AZ 85012-2504
  Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT 24

DANIEL L. LORBER, M.D., F.A.C.P. CDE
73 Essex Court
Port Washington, NY, 11050-4222
————
TELEPHONE (718) 762-3111
FAX (718) 353-6315
dll55@columbia.edu

October 26, 2008

Mr. P. David Lopez
US EEOC
Phoenix District Office
330 North Central Ave
Phoenix, AZ 85012-2504

Dear Mr. Lopez,

RE: NEZ, GERALD
EEOC Charge 350-2005-02442

I have now had the opportunity to review the additional medical records of Mr. Nez provided recently as Defendant's Fourth Supplemental Disclosure Statement (Kalil-MR-00003-00892). In addition, I have reviewed the Defendant's Preliminary Expert Disclosure Statement, dated 10 October, 2008 and the Supplemental Expert Report of Mitchell Parker, MD, undated, but faxed from Slutes, Sakrison, et al on 10/21/2008.

I will limit my opinion to Dr. Parker's reports and the medical records antedating Mr. Nez's termination on 31 January, 2005, as the records following that date have no bearing upon the decision to require a DOT physical or to terminate him.

Mr. Nez's master problem list from the chart indicates the presence of chronic kidney disease, obesity, diabetes mellitus, for which he could not tolerate metformin, and a history of alcohol abuse.

Mr. Nez's 2001 records showed some evidence of diabetic retinopathy. Records from 2002 are relevant for an ulcer on great toe of his right foot and the need for increasing oral agents. There are also several emergency room visits for trauma and muscle strain. In late 2002, it is noted that he was able to tolerate glyburide and metformin for his diabetes.

His blood sugars were elevated from 2001 to 2003 but the first records in late 2003 revealed a more normal blood sugar pattern. Hemoglobin A1C was generally elevated until March 2004 following which it will remain in or near the American Diabetes Association target range of 7%. In August 2004, A1C was 6.8, December 2004, 6.0, and March 2005, A1C was 5.6.

In January 2003, he is taking glyburide 5 mg twice a day, amlodipine 10 mg per day, losartan 50 mg, atenolol 25 mg, and atorvastatin. This results in good blood pressure control. In March 2003, he had a blood pressure of 135/87. A1C at that time was 9%. There was no history of hypoglycemic episodes. An eye exam on 03/26/2003 revealed his vision was "perfect" with "specs". Visual acuity without glasses was 20/25 and 20/50. There was moderate retinopathy and cataracts noted. He was prescribed glasses at that time. On 07/31/2003, there is a primary care visit at which time it was noted that Mr. Nez was depressed because he lost his job and had been drinking more. He presented with an infected toe at that time and was treated with intravenous antibiotics, oral agents, and insulin sliding scale.

On 11/14/2003, he is noted to be normotensive with a blood pressure of 118/72 and looking well. His diabetes is still poorly controlled with a hemoglobin A1C of 10.7% and, by this time, he has started insulin with NPH insulin 20 units in the morning and 10 units at bedtime. Random glucose at this visit is 237 mg/dL. Retinal (eye) exam on 11/25/2003 is similar to the prior exams.

A 2004 record revealed random glucose of 161 and hemoglobin A1C of 9% in January 2004. At this time, he is taking NPH insulin 25 units in the morning and 15 units at supper. Blood pressure at that visit is 161/99 and his weight is 259 pounds. By February 2004, however, his hemoglobin A1C had fallen to 6% with a random glucose of 103.

2001 through 2004, he also had number of visits to either Primary Care Clinic or the Emergency Department for electrolyte imbalances due in some cases to his diuretic therapy. His hemoglobin A1C in March and May 2004 was noted to be 7.1. Blood pressure in March was 151/94. His diabetes remained in good control on NPH and glyburide. Visual acuity on an April exam was 20/20 in one eye 20/40 -1 in the other eye. In May, he was noted to have developed significant leg edema and some decrease in renal function while maintaining good control of his diabetes and a blood pressure of 130/90. Early renal insufficiency was noted at that time. His primary physician also determined at that time that he had congestive heart failure. In May, he had episode of chest pain at which time myocardial infarction was ruled out. He was noted as having congestive heart failure at that time.

At this time, an echocardiogram also revealed evidence of diastolic dysfunction and a dilated left ventricle with decreased ejection fraction consistent with heart failure. He was found to have evidence of congestive heart failure without coronary atherosclerosis. He was treated in University Medical Center in Tucson and was discharged home in stable condition on several medications for heart failure and continued insulin on 05/20/2004. On 06/30/2004, he was seen in Primary Care Clinic. The blood pressure was 141/86 and the random glucose of 154. At this time, he continued to take two shots a day of insulin, glyburide, and his cardiac medications.

A visit on 08/03/2004, the Primary Care Clinic revealed a fingerstick glucose measurement of 102 with a hemoglobin A1C of 6.8% and a blood pressure of 157/97. No changes were made in his medication at that time. On 12/16/2004, he had a hemoglobin A1C of 6% and a blood pressure of 170/101 and 186/106. At this time, his Lasix dose was increased. The problem list includes type 2 diabetes "tight control", CKD, HTN "poor control" and "noncompliance with follow up". Blood pressure on 12/09/2004 was 160/95 and fingerstick glucose was 99.

Chest x-ray on 01/12/2005 revealed a right upper lobe infiltrate (pneumonia) with normal heart and vascular structures. Blood pressure at that time was 137/79 and the random glucose was 54 by fingerstick. At that time, it was recommend that he decrease his insulin until his pneumonia resolved. He was seen again on 01/26/2005 at which time his blood pressure was 98/53 without symptoms. He did have significant peripheral edema noted.

Subsequent to his termination from Kalil on 1/31/05, he was seen on 02/02/2005 by Dr. Murphy of the Nephrology Associates. It is noted in this HPI that he has a long history of noncompliance and of alcohol abuse. He is upset because he has lost his job due to his diabetes and is upset because he has not gotten disability. Dr. Murphy recommended improved glucose and blood pressure control. (NB: there are no scientific data to suggest that improved glucose control will have any effect on his kidney disease at this time). Although, his initial blood pressure was 173/99 repeat was 130/82.

Based on my review of the supplemental materials provided, it is still my considered opinion with a reasonable degree of medical certainty that Mr. Nez was substantially limited, compared to the average person in the population, by his diabetes and its long-term sequelae, including kidney disease, heart disease, and foot problems.

- Mr. Nez was required to inject himself with insulin twice a day and perform blood glucose monitoring.
- Although he had difficulty complying with diet, he was substantially limited in eating and food choices. Further, he was required to take a number of different medications on a regular basis.
- Mr Nez was substantially limited in walking due to diabetic neuropathy and congestive heart failure.
- Mr. Nez had multiple visits to the emergency department because of side effects of his diabetes treatment including
  - high sugars on a number of occasions,
  - pneumonia, and
  - infected foot ulcers.
- Subsequent to his termination by Kalil, Mr. Nez went on to develop further kidney disease, requiring dialysis to cleanse his blood of impurities.

Mr. Nez had substantial limitation in function of his endocrine, cardiovascular, neurological, and kidney systems.

Although Mr. Nez clearly qualifies as has having a disability due to his insulin requiring diabetes, this has nothing to do with the Kalil's requirement that he have a DOT card in order to work. This requirement does not have any relationship to the actual job duties.

In response and rebuttal to Dr. Parker's preliminary opinion and supplemental expert report, I must point out some errors in the points made therein. Although Mr. Nez had a history of elevated blood sugars, by the time he was hired, his glucose was in very good control with a hemoglobin A1C between 6 and 7.1. In other words, even if one took the position that an elevated A1C interfered with the ability to perform the job (which I do not), his A1C when hired was quite acceptable, especially when considering the effort it took to reduce it from above 10.0 to below 7.0.

And, as I shared above, an elevated hemoglobin A1C is not a disqualification for driving. In other words, an elevated A1C had nothing to do with his ability to perform the job. Mr. Nez's congestive heart failure was adequately controlled with medication as was his blood pressure on most occasions. Although his heart failure clearly was of a degree to limit his daily activities, such as walking and comfortable breathing, it did not limit his ability to drive a small truck or deliver beverages. Per ipheral edema and diabetic neuropathy certainly limited his ability to walk comfortably, but do not necessarily restrict the ability to drive pickup truck and Mr. Nez's blood pressure was more frequently in control than out of control during that time that he was evaluated for and working for Kalil. In other words, this gentlemen had physical maladies, but these in no way interfered with his ability to perform the essential functions of his job.

The history of refusal to monitor blood sugar, being "high risk" and being noncompliant is completely irrelevant to the decision to require a DOT physical exam. And one must remember that he did what we want patients to do, in becoming more vigilant. Through his efforts, he greatly reduced his A1C.

I hereby state with a reasonable degree a medical certainty that Mr. Nez was significantly limited by his diabetes and its complications in 2004-5. However, I can see no reason that Mr. Nez should have any restrictions on his driving - either personal or intra-state commercial. I can find no justification for requiring a DOT physical examination, which is specifically designed for interstate trucking. He was, in my view, a qualified person for the job he held.

Respectfully,

Daniel L. Lorber, M.D., F.A.C.P., C.D.E.
Clinical Associate Professor of Medicine
Weill Medical College of Cornell University