MARY JO O'NEILL, AZ BAR NO. 005924
P. DAVID LOPEZ, DC BAR NO. 426463
T. DIANA CHEN, AZ BAR NO. 021706
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
3300 N. CENTRAL AVE., SUITE 690
PHOENIX, AZ 85012-2504
TELEPHONE: 602-640-5016
FAX: 602-640-5009

E-MAIL:
MARY.ONEILL@EEOC.GOV
PATRICK.LOPEZ@EEOC.GOV
DIANA.CHEN@EEOC.GOV

ATTORNEYS FOR PLAINTIFF

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> KALIL BOTTLING CO., <br><br> Defendant. | No. CIV 07-488-TUC-CKJ <br><br> **PLAINTIFF EEOC'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> **(Oral Argument Requested)** |

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), moves this Court for summary judgment against Defendant Kalil Bottling Co. ("Defendant" or "Kalil") with respect to liability under Title I of the Americans With Disabilities Act ("ADA") and find that, as a matter of law: (1)  Gerald Nez was a qualified person with a disability at all relevant times; (2) Defendant terminated  Nez purely because he failed a Department of Transportation ("DOT") medical examination; and (3) Defendant's affirmative defenses are factually and legally insufficient.   This Motion is supported by the attached Memorandum of Points and Authorities and Plaintiff's Statement of Undisputed Facts ("SOF").

# I.  FACTUAL BACKGROUND

This is an action under Title I of the Americans with Disabilities Act of 1990 ("ADA") to correct unlawful employment practices on the basis of disability and to provide appropriate relief in the public interest and to Nez who was adversely affected by such practices.  It is alleged that Defendant violated the Title I of the ADA when it terminated the employment of Gerald Nez after imposing a discriminatory job qualification standard and terminated Nez from his position as a "merchandiser" because he was a disabled insulin-dependent diabetic.

Defendant hired Mr. Nez as a Merchandiser in August, 2004.   In this position, Nez drove his own 1997 Mazda pickup truck which was not a commercial vehicle and weighed less and 4,000 pounds.   (SOF ¶¶ 4, 5)In January, 2005, Defendant told Mr. Nez that he needed to pass the medical exam that is required for drivers of commercial motor vehicles.  (SOF ¶ 6). When Kalil asked Mr. Nez to undergo the DOT physical exam after having already worked for Kalil as a merchandiser for 5 months, the request was not related to any safety infractions or safety incidents.  (SOF ¶ 7). Defendant s not mandated by either the United States Department of Transportation or Arizona Department of Transportation to adopt the DOT standards or require Gerald Nez to pass a physical examination before Nez could be employed as a Merchandiser. (SOF ¶ 8).   As a result of applying the DOT physical qualification standards, Kalil removed Mr. Nez from the Merchandiser position because it discovered he was an insulin-using diabetic. (SOF ¶ 10). At the time he was removed from his position, he had performed all the essential functions of the Merchandiser position safely and without any incident for five months.  (SOF ¶ 10).

# II.    STATEMENT OF LAW

## A.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that a moving party is entitled to summary judgment if, based on the pleadings, depositions, answers to interrogatories, and any affidavits submitted, there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." If a party fails to establish the existence of an essential element of its case on which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Whether a fact is material is determined for summary judgment purposes by looking to relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment under Rule 56 is a proper method to dispose of meritless claims and affirmative defenses. *See Koch Indus., Inc., v. United Gas Pipe Line Co.*, 700 F.Supp. 865, 867 (M.D. La. 1988); *Laker Airways Ltd. v. Pan Am. World Airways*, 568 F.Supp. 811, 812 (D.D.C. 1983), *aff'd* 731 F.2d 909 (D.C. Cir. 1984)**.**

**B.   AT ALL RELEVANT TIMES, NEZ WAS A QUALIFIED INDIVIDUAL WITH A DISABILITY UNDER THE ADA**

The ADA prohibits employers from utilizing employment tests, standards, or other selection criteria that intentionally or unintentionally exclude qualified individuals with a disability. 29 U.S.C. §1630.10 app.   The statute defines the term "discrimination" to include "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability . . . unless standard, test, or other selection criteria, as used by the covered entity, is shown to be job-related *for the position in question* and is consistent with business necessity." 42 U.S.C. §12112(b)(6) (emphasis added). The term "qualification standards" is defined to mean "the personal and professional attributes including the skill, experience, education, physical, *medical*, safety and other requirements established by a covered entity [employer] as requirements which an individual must meet in order to be eligible for the position held or desired." 29 U.S.C. §1630.2(q) (emphasis added).

To qualify for relief under the ADA, the EEOC must show that Nez: (1) is a disabled person within the meaning of the statute; (2) is qualified, with or without a reasonable accommodation, to perform the essential functions of the job held; and (3) suffered an adverse employment action because of his disability. *Zivkovic v. Southern Cal. Edison Co.,* 302 F.3d 1080, 1090 (9th Cir. 2002); *Sanders v. Arneson Prod., Inc.*, 91 F.3d 1351 (9th Cir. 1996). Whether an individual is a qualified person with a disability is determined *as of the time of the discrimination*. *Bays v. Cassens Trans. Co.*, 212 F.3d 969, 974 (7th Cir. 2000) (emphasis added).

### 1. Nez was qualified for the position of merchandiser when Kalil removed him from this position and terminated him.

The ADA defines "qualified" as being an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111. Plaintiff must show that he is physically capable of performing the essential functions of position, with or without accommodation, and that he meets legitimate educational, training, experience, and other requirements set by employer for position. 42 U.S.C.A. § 12112(b)(5)(A). In determining that a particular employee is "qualified," the courts in a number of cases have placed particular, and in some instances **exclusive**, emphasis upon the fact that the employee had a history of past successful performance of the job in question or a like job. *See Doane v. City of Omaha*, 115 F.3d 624 (8th Cir. 1997) (police office with blindness in one eye "qualified" where he had served successfully in his job for many years following onset of condition); *Poff v. Prudential Ins. Co. of Am.,* 911 F. Supp. 856 (E.D. Pa. 1996) (former field engineer held the position from which he was discharged for over six years and received favorable performance evaluations).

Here, it is undisputed that Nez performed the duties of the merchandiser position flawlessly for over five months until Kalil removed him from the position because of a failed a DOT physical exam. (SOF ¶ 114, Ex. 1 ¶ 1). Kalil admitted

that Nez satisfactorily performed his job responsibilities during his tenure with Kalil, and was never disciplined during his employment.  Kalil has no evidence that  Nez committed safety infractions while serving as a merchandiser.  ((SOF ¶ 115, Ex. 1 ¶ 1, 2, 3, and 11; SOF ¶¶ 17, 24).   Kalil further admitted that other than the DOT physical, Nez satisfied the essential functions of the merchandiser position and that Nez failed the DOT physical solely because he was an insulin-dependent diabetic.  ((SOF ¶ 116, Ex. 1 ¶ 15)  Nez performed his job so successfully that Kalil gave him two pay raises during the approximately five months that he filled the merchandiser position, in September 2004 and late-October/early November 2004. (SOF ¶ 74, 75).

Kalil's imposition of the medical examination created an improper job qualification standard in violation of the ADA, as discussed below in Section II (D)(2).  Should the Court find that this medical examination was not job-related and consistent with business necessity, as urged below, it must find that  Nez was qualified for the merchandiser position.

### 2.     Nez was a person with a disability.

The record is undisputed that during the time he was employed at Kalil, and at the time of his termination,  Nez was as person with a disability.  To determine whether  Nez's diabetes constitutes a disability under the ADA, three questions must be answered: (1) whether diabetes is a physical or mental impairment; (2) whether the activity or activities affected by diabetes are major life activities; and (3) whether  Nez is substantially limited in one or more major life activities because of this impairment.  *See generally Bragdon v. Abbott*, 524 U.S. 624 (1998).

### (a)     Nez suffered from the physical impairment of type 2 diabetes at all relevant times.

With respect to the first prong of the disability test, Defendant and the EEOC agree that during the time of his employment with Kalil, Nez suffered from

the physical impairment of type 2 diabetes. (SOF ¶117, Ex. 1 ¶ 6, 7) Thus, the EEOC satisfies the first prong.

**(b)** **Eating,  Walking, Breathing and Production of Insulin are Major Life Activities.**

Next, EEOC must show that the impairment affected at least **one major life activity**.  Major life activities are the basic activities that average persons can perform with little or no difficulty.  29 C.F.R. § 1630.2(i).  Eating, walking, and breathing are each well-established "major life activities." 29 C.F.R. § 1630.2(i); *see Toyota Motor Mfr., Ky., Inc. v. Williams,* 534 U.S. 184,197 (2002)(walking is a major life activity); *Fraser v. Goodale,* 342 F.3d 1032, 1038-40 (9th Cir. 2003)(breathing and eating are major life activities); *Herman v. Kraevner of Philadelphia Shipyard, Inc*., 461 F. Supp. 2d 332 (E. D. Pa. 2006) (secreting insulin/metabolizing food is a major life activity).  The Supreme Court has stated that "major" means important, but that major life activities are not limited to those aspects of a person's life that have a public, economic, or daily character. *Bragdont,*  524 U.S. at 638 (1998).  Because there is no dispute that Nez suffered from a physical impairment that affects at least one of these major life activities, the second prong of the disability definition is also satisfied.

**(c)** **Nez was substantially limited in his ability to perform at least one major life activity affected by type 2 diabetes.**

Finally, with respect to whether any one of these major life activities is "substantially limited," by his diabetes, the EEOC regulations define "substantially limited" as "[u]nable to perform a major life activity that the *average person in the general population* can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the *average person in the general population* can perform that same major life activity."  29 CFR § 1630.2(j) (2001).   Under the EEOC regulation, the determination of whether an individual is substantially limited in a

major life activity should be based on the following factors: the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment. 29 CFR §§ 1630.2(j)(2)(i)-(iii).

In *Toyota Motor Mfg. v. Williams*, the Court was guided by the common definition of "substantially limits" which means "considerable" or "to a large degree." 534 U.S. at 196 (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (1976). In *Bragdon*, the Supreme Court distinguished "substantial limitations on major life activities" from "utter inabilities." 524 U.S. at 641.

Here, the evidence undisputedly reveals that Nez's diabetes substantially limited, not just one, but four major life activities. In his initial expert report (dated September 4, 2008), Dr. Daniel Lorber, M.D., a board certified endocrinologist and EEOC's expert witness, opined that Nez was substantially limited, compared to the average person in the population, in the major life activities of walking, eating, breathing, and insulin production while Nez was employed at Kalil. (SOF ¶ 27, 35, 37, 53-57, Ex. 20, Ex. 24, Ex. 27). In his expert reports, Dr. Lorber discussed the medical records he reviewed, relevant medical literature, and his unique medical/professional association memberships and expertise upon which he based his expert opinions. (SOF ¶ 118, Ex. 20&27) Dr. Lorber subsequently authored a rebuttal report (dated October 26, 2008) to respond to (1) the expert report of Kalil's expert witness, Dr. Mitchell Parker, M.D. and (2) additional medical records that were obtained by the parties. (SOF ¶ 119, Ex. 24 &27) In this second report, Dr. Lorber concluded that after reviewing this additional information, "it is still my considered opinion with a reasonable degree of medical certainty that Nez was substantially limited, compared to the average person in the population by his diabetes…" in major life activities including walking, eating, breathing and insulin production. (SOF ¶ 120, Ex. 24)

With respect to eating, type 2 diabetes affected  Nez's ability to metabolize carbohydrates, requiring him to live on a very restricted diet that was low in carbohydrates or face uncontrolled blood sugar and the potential results of hypoglycemia and stroke.  Also, Nez, unlike the average person in the population, could not skip meals; doing so would risk falling to unsafe blood sugar levels. The average person in the population does not experience these eating related limitations. (SOF ¶ 121, Ex. 27)

Dr. Lorber testified consistent with his reports during his oral deposition, explaining that with respect to walking, Nez suffered from neuropathy in his feet, a common result of advanced type 2 diabetes.  This means that the nerves in his feet were dying, resulting in a loss of sensation and heightened susceptibility to food ulcers.  This loss of sensation and heightened susceptibility to ulcers is not experienced by the average person in the population.  (SOF ¶ 122, Ex. 27)   Nez's wife, Shirley Sutter, also sets forth in a declaration the substantial everyday limitations Nez experienced in the major life activity of eating.  (SOF ¶ ¶ 58-63).

With respect to breathing, Nez's medical records reflect that, secondary to diabetes, he suffered from congestive heart failure.  Congestive heart failure means that Nez would have been limited in his ability to breathe in a way not experienced by the average person in the population.  (SOF ¶  123, Ex. 27)

In addition, due to Nez's diabetic condition, his body could no longer produce insulin in a manner that the average person in the population can and, therefore, he was required to administer insulin twice a day via painful self injection.  (SOF ¶  124, Ex. 27)

Kalil has offered absolutely no contradictory evidence that  Nez was disabled at all relevant times.  When asked about Dr. Lorber's reports and findings, Kalil's own expert witness, Dr. Mitchell Parker, testified in his deposition that: the methodology Dr. Lorber applied in reaching his expert opinion was sound (SOF ¶ 25); that Dr. Lorber was a well-trained physician (SOF ¶ 26);

and Dr. Parker agreed with *everything* stated in Dr. Lorber's initial expert report, dated September 4, 2008 and rebuttal report, dated October 26, 2008. (SOF ¶ 27, 35, 37) In fact, Kalil's expert  opined that  Nez was so ill from diabetes and its effects that he was at high risk of dying of a heart attack or stroke at anytime within two years.  (SOF ¶ 39)

Nez's wife, Shirley Sutter, observed Gerald give himself insulin shots in his stomach twice a day, including during the period of his employment with Kalil. (SOF ¶ 125, Ex. 10, Declaration of Shirley Sutter) He had to do this on a regular schedule—once at night and once in the morning and to adjust his schedule around his injections. (SOF ¶ 125, Ex. 10)   Nez also had to give himself glucose tests, including the time when he worked for Kalil. He punctured himself in the stomach or the finger, twice a day. (SOF ¶ 126, Ex. 10) During their marriage, including the time Nez worked for Kalil, his wife observed Gerald closely monitor the type and quantity of food he ingested every day.  (SOF ¶ 127, Ex. 10)  He was very limited in what he could eat and had to monitor what and how much he ate. He could not eat foods with high sugars or potassium.  (SOF ¶ 127, Ex. 10) This monitoring took considerable time.  (SOF ¶ 127, Ex. 10) During the time he worked for Kalil,  Sutter observed that Nez went to the doctor frequently, sometimes once a month, to monitor his diabetes. (SOF ¶ 128, Ex. 10)

With respect to this second prong of the disability test, it is undisputed that at all relevant times, type 2 Diabetes impacted  Nez's ability to eat, walk, breathe, and produce insulin.  EEOC's expert witness, Dr. Daniel Lorber, M.D., and Defendant's expert agree that type 2 diabetes affected  Nez's ability to eat, walk, breath, and produce insulin.  (SOF ¶ 53-57, Ex. 20, Ex. 24, Ex. 27, Declaration of Daniel Lorber; SOF ¶ 27, 35, 37).Therefore, there is absolutely no dispute of fact that Nez was substantially limited in at least one major life activity and therefore meets the ADA definition of person with a disability.

## C.   KALIL FIRED NEZ BECAUSE HE FAILED THE

# DOT PHYSICAL EXAM

EEOC alleges that Kalil fired Nez because he failed the DOT Medical Examination in January 2005.  (Plaintiff's Complaint, Dkt. #1) It is undisputed that Nez was removed from his merchandiser position because he was an insulin-using diabetic.  (SOF ¶ 129; Ex. 1 ¶ 15-16; SOF ¶ 75; SOF ¶ 10).  In fact, Defendant admitted  "that on or about February 1, 2005, Defendant terminated Nez because he had not passed the DOT physical examination and/or obtained a commercial driver's license." (SOF ¶ 129; Ex. 1 ¶ 16)

 Throughout this litigation, however, Defendant has claimed that following Nez's removal, it offered him a temporary accommodation in the warehouse, and the actual reason for Nez's termination was his failure to appear for work, otherwise referred to as no-call-no-show ("NCNS").

> In an attempt to understand the basis of Defendant's contention that Nez was fired for a reason other than the DOT exam failure, EEOC propounded an interrogatory asking Defendant to identify all documents or witnesses with knowledge of the reasons for Nez's termination.

In Defendant's Nov 11, 2008 response, it identified: Bob Nagore; Lex Herding [sic]; George Kalil; Jeff Hill; Acey Christie; and the status Change for  Nez dated 1/26/05 and 2/2/05." (SOF ¶ 130, Ex. 25, ¶ 14). Defendant never supplemented this response.

Each of these five individuals identified by Kalil were deposed during discovery and each was questioned about the circumstances of  Nez's termination. Bob Nagore, testified that he did not know that  Nez was terminated for NCNS until he had a conversation with Lex Heerding a week before Nagore's deposition on September 3, 2008—roughly 3.5 years after  Nez's employment with Kalil ended.  (SOF ¶ 64)

Lex Heerding testified that he was under the belief that  Nez was terminated for NCNS but could not remember how he learned this.  (SOF ¶ 65)  Heerding does not know who determined that  Nez failed to arrive for work, and does not

remember arriving at that conclusion based on his own observations. (SOF ¶ 65) Mr. Heerding did not remember confirming with the warehouse supervisor, who took attendance of warehouse workers, that Nez was NCNS.  (SOF ¶ 67) Mr. Heerding admits that someone should have consulted with the warehouse supervisor before Nez's termination was finalized. (SOF ¶ 67)

Cecelia "Acey" Christie testified that she was directed by manager Steve McCullough to fire  Nez because he failed the DOT physical. Ms. Christie's signature is on the Status Change form that states Nez was terminated due to the DOT physical examination failure. (SOF ¶ 75)  However, Stephen McCullough testified that he does not remember a former Kalil employee named Gerald Nez. (SOF ¶ 71-72)

Jeff Hill testified that he didn't remember a Gerald Nez and that he did does not remember why or how Nez's employment was terminated with Kalil. (SOF ¶ 80)

With respect to documentation, Heerding, Kalil's human resources official, and McCullough, a high ranking manager who worked at its corporate office, admitted that termination reasons should have been documented in a Status Change form.  (SOF ¶ 66, 71,73, 76)  They testified that Status Change forms should reflect the *actual* reason for an employee's termination. (SOF ¶ 66, 71,73, 76)  The Status Change form to which Defendant refers in its interrogatory response unequivocally states that the reason for Nez's termination is "Employee did not pass the required DOT physical."  (SOF ¶ 75)

Also, the "Claimant Quality Control Wage Verification" form that Kalil submitted to the Arizona Department of Economic Security in response to  Nez's claim for unemployment benefits states that Nez was "unable to pass required physical" in the section of the form asked for "reason for separation." (SOF ¶ 12, Ex. 15)

In sum, none of the individuals identified by Defendant testified that they had personal knowledge that the reason for Nez's termination was due to no-call-

no-show.  Rather, most everyone testified that they had no personal knowledge of or had forgotten the reason for Nez's termination.  Kalil produced absolutely no admissible evidence that Nez failed to appear for work when scheduled or that the actual reason he was terminated was due to no-call-no-show.  Kalil's owne documentation states that Nez was fired due to the DOT physical. The evidentiary record remains undisputed that Nez was fired because he failed the DOT medical exam in January 2005.

### D.  DEFENDANT'S AFFIRMATIVE DEFENSES ARE FACTUALLY AND/OR LEGALLY INSUFFICIENT

In Defendant's Answer (Dkt. 5), it asserted the following affirmative defenses:  laches, waiver and estoppel, statute of limitations, and failure to state a claim upon which relief can be granted.  In an effort to understand the factual basis for these affirmative defenses, the EEOC issued a pointed interrogatory to Kalil on April 28, 2008. (SOF ¶ 132)  Defendant's June 9, 2008 response stated:

> In its Answer, Defendant asserted the affirmative defenses of statute of limitations, waiver, laches and failure to state a claim upon which relief can be granted.  Such defenses were listed in order to preserve such defenses should evidence supporting such be located during the course of discovery.  At this point, as discovery is still ongoing, Defendant does not have evidence to support such affirmative defenses.  However, Defendant reserves the right to supplement this Interrogatory should such evidence be located or disclosed (SOF ¶ 132).

Despite its ongoing duty to supplement its answers to discovery questions, Kalil has never modified or supplemented this response.  Thus, even after all discovery has been completed, Kalil has effectively indicated that it is still without evidence to support any of the affirmative defenses raised in its Answer.

In the Case Management Plan filed with this Court, but *not* in its Answer or in response to EEOC Interrogatories, Defendant asserted two additional affirmative defenses:  (1) that  Nez presented a direct threat to his safety or the safety of others and (2) that Kalil's application of a qualification standard was job-

related and consistent with business necessity. (Dkt. 8).  In the Ninth Circuit, "If [a] defense is not raised in the answer or responsive pleading, it is generally waived."  *In re Santos,* 112 B.R. 1001, 1008 (9th Cir. 1990) (citation omitted).  Because Defendant failed to provide any factual bases for any of its affirmative defenses and did not timely raise two of the asserted affirmative defenses, they should be stricken.

   1.   **Defendant cannot meet its burden of proof regarding its direct threat affirmative defense**

Even if the court finds that the "direct threat" defense was timely raised, Defendant cannot meet the crieteria.  The ADA provides that "the term, 'direct threat' means a significant risk to the health or safety of others ***that cannot be eliminated by reasonable accommodation*.**"  42 U.S.C. §12111(3) (emphasis added).  Because it is an affirmative defense, the burden of establishing a direct threat lies with the employer.  *Hutton v. Elf Atochem N. Am. Inc.,*  273 F.3d 884, 893 (9th Cir. 2001).  Before excluding an individual from employment as a direct threat, an employer must demonstrate that it has made an ***"individualized assessment"*** of the employee's ability to perform the essential functions of the job, "based on a ***reasonable medical judgment*** that relies on the ***most current medical knowledge*** *and or the best available* ***objective*** *evidence."*  29 C.F.R. §1630.2(r) (emphasis added).  A subjective belief in the existence of a risk, even one made in good faith, will not shield the decision-maker from liability.  *Bragdon,* 524 U.S. at 649.  The required assessment may not be based upon mere "common sense," but rather only upon—at minimum—a consultation with a medical professional who has made an objective scientific judgment. *Id.* at 629.  The factors[1] to be considered when determining whether an individual poses a direct threat include:  (1) the duration of the risk; (2) the nature and severity of the

---

[1] These factors were first articulated by the Supreme Court in *Sch. Bd. Of Nassau Coutny v. Arline,* 480 U.S. 273, 288 (1987) and are, therefore, commonly referred to as the "Arline factors."

potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm.  29 C.F.R. §1630.2(r); *Echazabal v. Chevron USA, Inc.,* 336 F.3d 1023, 1027-28 (9th Cir. 2003).

> **(a)     Kalil failed to conduct an individualized assessment of Nez's ability to perform the job of merchandiser.**

Kalil's direct threat defense cannot shield it from liability because Kalil failed to conduct an individualized assessment of whether Nez posed a danger as a merchandiser due to his diabetic condition.  After Kalil received notice from its medical services contractor that Nez failed the DOT physical because of insulin use, no further inquiry was performed and Nez was fired.

In *Echazabal,* Chevron revoked a conditional promotion offer when a pre-employment physical examination found that Echazabal's liver released higher than normal enzyme levels.  *Id.* at 1026.  Chevron argued that its reliance on its own doctors constituted a facially reasonable and thus legally sufficient individualized assessment. The Ninth Circuit rejected this argument, holding that Chevron failed to satisfy its burden because, "the employer must gather 'substantial information' about an employee's work history and medical status . . . [t]he decision must be based upon 'particularized facts using the best available objective evidence' as required by the regulations." *Id.* at 1028.

Kalil's 30(b)(6) designee, Bob Nagore, testified that when faced with a DOT physical examination failure of an employee or applicant, Kalil does NOT seek an individualized assessment by a doctor.  Nagore testified that "We look at the front page that says whether he passes or fails."  Kalil never seeks additional information, for example, from a treating physician. (SOF ¶ 14)  Nagore further admitted that after Kalil received notice that  Nez failed the DOT physical examination, it made no effort to contact  Nez's doctor(s) or otherwise determine how diabetes affected Nez individually before removing  Nez from his merchandiser position. (SOF ¶ 48)  Furthermore, according to Carl Lattimer, Kalil's Fleet and Safety manager since 1988, also stated that Kalil does not

conduct an individualized assessment of whether a driver is safe to drive when that drive fails the DOT physical for reasons such as insulin-dependence. (SOF ¶ 81) Given these facts, Kalil cannot sustain its direct threat defense under *Echabazal*.

George Kalil, testifying as a 30(b)(6) designee, testified that he was unaware of anything in  Nez's medical history that would indicate that  Nez would be a significant threat if he remained on the road.  Simply put, Mr. Kalil testified, "I don't think I knew anything about him--I don't even think I know anything now about him ...."  Clearly, Kalil did not have enough information to assess the whether Nez would be a danger to the public if he continued to drive. (SOF ¶ 52)

Jonell Norris, another of Kalil's 30(b)(6) representatives, testified that Kalil did not regard Nez as an imminent danger or risk because of his diabetes.  (SOF ¶ 19)  30(b)(6) designee, Bob Nagore, testified that "based on the information that Kalil had after he [Nez] took the DOT physical," Kalil was *not* able to assess the likelihood that Nez might be involved in some sort of safety incident.  Nagore further admitted that Kalil didn't have enough information to make such an assessment and admitted that Kalil did not regard Nez as an imminent threat on the road.(SOF ¶ 50-51).

> **(b)      Even if Mr. Nez posed a direct threat, which he did not, Kalil was obligated to consider giving Nez a reasonable accommodation, which it did not.**

Even if Kalil had performed a sufficient individualized assessment of Nez's health condition, it still cannot prevail under a direct threat affirmative defense because it failed to consider whether the threat could have been ameliorated by a reasonable accommodation.  As discussed, "the term, 'direct threat' means a significant risk to the health or safety of others ***that cannot be eliminated by reasonable accommodation*.**"  42 U.S.C. §12111(3) (emphasis added). Under the ADA, an individual with a disability is entitled to a reasonable accommodation unless the accommodation would cause an undue hardship to the employer.  42 U.S.C. §12112(b)(5).  A reasonable accommodation is "any change

in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities." 29 C.F.R. §1630.2(o) app.

Reasonable accommodations may include, but are not limited to, making exceptions or modifications to neutral policies or practices, 29 C.F.R. §1630.2(o)(3); reassignment to a different position, 42 U.S.C. § 12111(9)(B); or transfer to a lesser paying job, 29 C.F.R. § 1630.2(o) app, *Altman v. N.Y. City Health & Hosps. Corp.,* 903 F.Supp. 503, 514 (S.D.N.Y. 1995)(reassigning doctor to attending position reasonable where he could no longer act as chief of medicine due to disability), *aff'd*, 100 F.3d 1054 (2d Cir. 1996).

Here, it is undisputed that Kalil never considered accommodating Nez before terminating him.  William Ourand, the Chief Financial Officer for Kalil, testified that he did not feel the company owed Nez a reasonable accommodation after the DOT physical results showed he failed.  He stated, "...we make all of our other people abide by it. We would have to start going out and make exceptions for everybody."  He further testified, that, "if you can't pass the DOT, I don't believe--I don't know, but I don't believe it's a Disabilities Act violation as long as you follow what they tell you to do.  The doctor is the one that said he's disqualified." (SOF ¶ 101).

Nonetheless, it is also undisputed that Kalil could have offered  Nez a permanent warehouse position without suffering undue hardship.  After Nez failed the DOT physical, Kalil claims it offered him a temporary job in the warehouse, contingent on passing within 30 days. (SOF ¶ 78).  Heerding, Kalil's HR person in its Flagstaff office during the time  Nez worked for Kalil, testified as to the difficulties in filling positions in the warehouse. (SOF ¶ 76) At the time Nez failed his DOT physical, there were openings in the warehouse. (SOF ¶ 69) Warehouse positions paid less than merchandiser positions, too, meaning the accommodation would have been inexpensive. (SOF ¶ 78).  However, Bob Nagore testified that

Kalil did not offer Nez a permanent position in the warehouse. (SOF ¶ 78-79). An accommodation could have been offered to Nez without undue burden to Kalil.

### 2. Defendant cannot meet its burden of proof regarding its job-related and consistent with business necessity defense

As discussed *supra*. at 3, an employer is prohibited from using a qualification standard unless the employer proves that the standard is job-related and consistent with business necessity; the job-relatedness defense requires that the employer also prove that no reasonable accommodation would enable the individual to do the job.  See 42 U.S.C. § 12113.  Kalil currently, and at the time of  Nez's employment, required all Merchandisers to satisfy the DOT physical qualifications standards regardless of the weight of the vehicle. (SOF ¶ 2).  Kalil's policy of requiring drivers to pass the DOT physical qualification standard is a "qualification standard" within the meaning of 42 U.S.C. § 12112(b)(6), that screened out Nez because of a disability (diabetes).

DOT regulations do not apply to vehicles which weigh well under 10,001 pounds and are not used to transport 15+ passengers or hazardous materials.  See 49 C.F.R. §350.105.   During his employment with Kalil, Nez drove his own 1998 Mazda pickup truck, which was not a commercial vehicle. (SOF ¶ 2).  Moreover, diabetics are not restricted per se from driving under Arizona state law. *See* http://www.azdot.gov/mvd/custsvguide.asp (Arizona Driver License Manual does not bar diabetics or insulin-users from obtaining a valid Arizona driver's  ). Accordingly, Nez had a valid Arizona driver's license and a good driving record. (SOF ¶ 132).

Kalil's job description for the Merchandiser position requires the employees to drive their own vehicles and carry their own insurance.  (SOF ¶ 98). Defendant does not claim that Nez's personal pick-up truck was a "commercial vehicle" under DOT regulations.  Even Merchandisers who drive Kalil-owned vehicles drive Chevy Colorados, which are "small pick-up trucks" weighing  far less than 10,000 pounds. (SOF ¶ 3).     Defendant admits that it was not mandated

by either the United States Department of Transportation or Arizona Department of Transportation to adopt the DOT standards or to require Nez to pass a physical examination before Mr. Nez could be employed as a Merchandiser.  (SOF ¶ 8)   It adopted the standard at its own discretion.

Under 49 C.F.R. §391.41 (b)(3),  the DOT physical qualification standard pertaining to diabetics, a "person is physically able to drive if that person has no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control."   Because Kalil chose to apply the DOT physical qualification standards to non-DOT regulated vehicles, Kalil  removed Nez from the Merchandiser position.  As noted above, there was no effort to assess individually whether Nez posed any safety risks.  Defendant understood that its policy of applying the DOT physical qualification standard operated as a blanket exclusion for insulin using diabetics. (SOF ¶¶ 87 and 97)

### (a)   Kalil Cannot Demonstrate that Its Use of DOT Physical Qualification Standard is Job Related and Consistent with Business Necessity

As noted above, Defendant has not asserted business necessity as an affirmative defense and did not articulate business necessity as a defense in response to EEOC interrogatories. Nevertheless, because Defendant has raised this defense at various points in the litigation, the EEOC will address it and show that Kalil is unable, as a matter of law, to prove all elements of the "business necessity" defense.

Although the ADA does not define the terms "job-related" and "consistent with business necessity," the legislative history specifies that there must be a "match" or "fit" between a particular job requirement and an applicant's ability to do the job. H.R. Rep. No. 485(III), 101st Cong., 2d Sess. 31 (1990) ("Judiciary Report"), reprinted at 1990 U.S.C.C.A.N. 445, 454.  Accordingly, to ensure the necessary fit, and thereby satisfy the statutory business-necessity standard, the requirement must relate to an essential, non-marginal, aspect of the job and be

"carefully tailored to measure the [applicant's] actual ability to perform an essential function of the job." *Id*. at 32, reprinted at 1990 U.S.C.C.A.N. at 455; 29 C.F.R. Pt. 1630 App. § 1630.10.

First, "[t]o show 'job relatedness' an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential functions of the job." *Bates v. UPS*, 511 F.3d 974, 996 (9th Cir. 2007). "When every person excluded by the qualification standard is a member of a protected class – that is, disabled persons – an employer must demonstrate a predictive or significant correlation between the qualification and the performance of the job's essential functions." *Id*.  "'An employer urging a business necessity defense must validate the test or exam in question for job-relatedness to the specific skills and physical requirements of the sought-after position.'" *Id.* at n. 12 (quoting *Belk v. Sw. Bell Tel. Co*., 194 F.3d 946, 951 (8th Cir. 1999)).

Second, the employer must also show that the qualification standard is "consistent with business necessity."  To satisfy this element, "the employer must show that [the qualification standard] "substantially promote[s]" the business's needs. [Citations omitted.]  As we observed in *Cripe*: 'The business necessity standard is quite high, and not to be confused with mere expediency.'" *Bates*, 511 at 998, citing *Cripe*, 261 F.3d at 890.   The court continued: "For a safety-based qualification standard, '[i[n evaluating whether the risks addressed by . . .  [the] qualification standard constituted a business necessity, the court should take into account the  magnitude of possible harm as well as the probability of occurrence.'" *Id.* (quoting *EEOC v. Exxon Corp*., 203 F.3d 871, 875 (5th Cir. 2000)).

Defendant has, at various times asserted different reasons. Defendant claims that it adopted the policy for two reasons: "to ensure the safety of the public and, from Kalil's standpoint, to reduce exposure to liability." (SOF ¶ 85). During the investigation, Defendant claimed that adoption of the DOT physical qualifications standards was necessary to reduce its insurance costs.  (SOF ¶ 86).

Finally, Defendant also suggested that it adopted the policy in order to promote Merchandisers to commercial drivers. (SOF ¶ 111). Regardless, Defendant has not and cannot articulate a factual basis for any "business necessity" defense sufficient to survive summary judgment.

        **(b)**     **There is no evidence that Kalil's adoption of the DOT regulation promotes safety.**

First, Defendant contends that "certain health conditions pose a threat to the general public such that drivers with such conditions are not qualified to drive commercial vehicles." (SOF ¶ 87). As noted above, the EEOC unequivocally affirms that Defendant and the public have an interest in ensuring that its drivers are safe and do not pose enhanced accidents risks. However, Defendant is unable present any facts showing that the adoption of the DOT physical qualification standard for merchandisers driving their own personal non-DOT-regulated vehicles achieves this objective. Defendant has not come forward with any evidence, such as job analyses or validity studies, showing any correlation between DOT physical requirements and the essential functions of any driving position, including Merchandiser. (SOF ¶¶ 88, 102, and 110). Moreover, Defendant is unable to identify any diabetic-related causes pre-dating the policy which may have inspired the policy. (SOF ¶¶ 93 and 94). .

In contrast, Dr. Lorber, has stated that his review of the scientific data does not reveal any evidence that persons with type 2 diabetes pose an enhanced risk while driving. There no any evidence in the record to the contrary. Dr. Lorber has been engaged in the practice of endocrinology for 31 years. In 2006, Dr. Lorber served on an expert panel of consultants advising the Federal Motor Carrier Safety Administration (FMCSA) Medical Review Board on medical issues related to diabetes and driving. As part of this panel, Dr. Lorber reviewed relevant medical literature related to commercial drivers and diabetes. Based on his experience and review of relevant literature, Dr. Lorber concludes: "(1)There is no evidence for increased crash risk in Commercial Motor Vehicle Drivers on insulin; (2)

Accident risk for Commercial Motor Vehicle Drivers was repeatedly associated with age, miles driven, time of day or night, and .. . type of road driven. There is no consistent pattern and no hypoglycemia, with either insulin treatment, no hypoglycemia and motor vehicle accident.; and (3) In the Type 2 diabetes population hypoglycemia is not likely to account for any increased risk of accidents and insisting on insulin use being an absolute contraindication to commercial driving is unscientific, inappropriate, and contrary to the weight of medical literature." (SOF ¶ 90)

Defendant has not offered any facts rebutting Dr. Lorber's analysis or otherwise showing that its blanket exclusion of type 2 diabetes is, in fact, job related and consistent with business necessity.   In fact, Defendant's own expert concurs with Dr. Lorber's conclusions. (SOF ¶ 25, 27, and 35).

Here, none of the Merchandisers drive DOT regulated vehicles.  They either drive their own vehicles, as is required under the Merchandiser job description, or "small" company pick-up trucks.  (SOF ¶ 3).   These vehicles are all significantly below the DOT-regulated threshold and are, in fact, passenger vehicles.  There is simply is no legitimate factual issue as to whether  Nez's 1997 Mazda pick-up truck shares the same risk characteristics as DOT-regulated vehicles weighing more than 10,000 pounds.[2]

Given the size of the vehicles, the likelihood that any accident would be catastrophic is reduced.  As Dr. Lorber stated:  "The DOT physical was designed for people who drive long distance interstate trucking.  This is not designed to restrict people on -- on major interstate highways and -- and decrease the rate of

---

[2]  According to the DOT, "[m]ost vehicles having a GVWR of 10,000 pounds or less have operating characteristics similar to a large automobile and generally pose no greater safety risk than other vehicles of similar or lesser weight when used on the highway." 53 Fed. Reg. 18,042 (1988);  *Morton v. UPS*. 272 F.3d  1249, 1264-1265 (9th Cir. 2001), *overruled on other grounds*, *Bates v. UPS*..

crashes in that setting.  It was not designed for people who drive a  light-weight truck or a personal vehicle in relatively rural areas.  (SOF ¶ 91).

       (c)     **The Reduction of Insurance Costs is not a Job Related or Consistent with Business Necessity**

Defendant has also claimed that it adopted the DOT policy in order to lower its car insurance premiums.  Lower insurance costs, while a business interest, are not an essential function of the Merchandiser job and provide insufficient support for a "business necessity" defense.  As noted above, proving job relatedness is an essential component of the business necessity defense. See *supra*. at  17.  *Accord Cripe,* 261 F.3d at 887 (criterion must be "necessary and related to the specific skills and physical requirements of the sought-after position").  Moreover, Kalil has also failed to provide any evidence showing that adoption of the DOT physical qualification standard, in fact, led to lower insurance rates.

It is undisputed that the DOT standard was not required by Kalil's insurers and that no insurance company advised Kalil that adoption of the policy would lower its insurance costs. (SOF ¶¶ 92 and 109).  Instead, Defendant adopted the DOT physical qualification standards in the early 1970s, around the same time it overhauled its entire safety program.  When Kalil adopted the policy, it also adopted a strict vehicle maintenance regime, driver safety reviews, drug screens, training, and other measures designed to reduce the number of accidents.  (SOF ¶¶ 95, 104, 107)  According to Defendant's long-time insurance broker, this safety overhaul was used as a "sales pitch" to obtain lower premiums from insurance companies. (SOF ¶ 109). Defendant, however, cannot prove that adoption of the DOT physical qualification standards played any role in lower insurance costs at all or the extent of such a role. (SOF ¶¶ 95, 105)

Kalil's claim is even more tenuous as applied to Merchandisers.  As discussed, Kalil required Merchandisers like Nez to use their own vehicles and to carry their own insurance. (SOF ¶ 98).  Nez, not Kalil, had the primary

responsibility to cover any accidents.  Defendant admitted that *this* policy had demonstrated costs savings, unlike the DOT physical requirement.  (SOF ¶ 98).

At best, Defendant's claim that the adoption of the DOT policy for merchandisers driving their personal vehicles lowered its insurance rate is speculative.  The EEOC Technical Assistance Manual on the Employment Provisions of the ADA, § 6.4 states that the results of a medical examination "may not be used to disqualify persons who are currently able to perform the essential functions of a job… because of fear or speculation that a disability may indicate a greater risk of future injury, or absenteeism, or may cause future workers' compensation or insurance costs."  *See also Rodriguez v. ConAgra Grocery Pro. Co.*, 436 F.3d 468, 483-484 (9th Cir. 2006) ("…speculation about the hypothetical risks posed by a diabetic is not a legitimate ground on which to make an employment decision.").

### (d) Internal Promotion is not an Essential Function of the Job

George Kalil, testified that one of the reasons Defendant demanded DOT certification for merchandisers is because the company wanted to promote from within.  Defendant wanted to easily pull from merchandisers to serve as drivers whenever the need arose.  The driver's had "commercial driver's licenses."  (SOF ¶ 112).

However, this goal is not job related or consistent with business necessity because it is not related to the performance of any of the essential functions of the Merchandiser position.  Moreover, Tom Kimbro testified that merchandisers are not obligated to become drivers over the course of their employment.  (SOF ¶ 112).  In addition, a "commercial driver's license" was not required of merchandisers.

## III.    CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the EEOC's Motion for Partial Summary Judgment be granted in its entirety.

RESPECTFULLY SUBMITTED this 19th day of December, 2008.

MARY JO O'NEILL
Regional Attorney

P. DAVID LOPEZ
Supervisory Attorney

By: s/P. David Lopez
     P. DAVID LOPEZ

T. DIANA CHEN
Trial Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Phoenix District Office
3300 N. Central Ave., Suite 690
Phoenix, Arizona  85012

Attorneys for Plaintiff

1

## CERTIFICATE OF SERVICE

2       I certify that on this 19th day of December, 2008, I electronically

3

transmitted the attached document to the Clerk's Office using the CM/ECF

4

5    System for filing and transmittal of a Notice of Electronic Filing to the following

6    CM/ECF registrants:

7

8

James M. Sakrison,Esq.
9              Diana L. Kanon-Ustariz, Esq.

10     Slutes, Sakrison & Rogers, P.C.
       4801 E. Broadway, Suite 301
11             Tucson, AZ 85701

12     Attorneys for Defendant

13

14
       _____
15             Rosanne T. Wood
               Lead Paralegal Specialist
16

17

18

19

20

21

22

23

24

25

26

27

28