## <u>EXHIBIT LIST</u>

EXHIBIT 29:     Deposition of Mitchell Stuart Parker, M.D. dated 11/20/2008

EXHIBIT 30:     Deposition of Daniel Lorber, M.D., dated 11/25/2008

EXHIBIT 31      Deposition of Stephen McCullough dated 12/03/2008

EXHIBIT 32:     Declaration of Shirley Sutter

1

1          UNITED STATES DISTRICT COURT

2               DISTRICT OF ARIZONA

3

4  EQUAL EMPLOYMENT OPPORTUNITY          )
   COMMISSION,                           )
5                                        )
               Plaintiff,                )
6                                        )
   v.                                    )  Case No.
7                                        )  4:07-cv-488-TUC-BPV
   KALIL BOTTLING CO., an Arizona        )
8  corporation,                          )
                                         )
9               Defendant.               )
                                         )
10 _____)

11

12    .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

13         DEPOSITION OF MITCHELL STUART PARKER, M.D.

14                  November 20, 2008

15                   Tucson, Arizona

16    .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

17

18         Transcript prepared by Bonnie J. Humm

19           Certified Reporter No. 50722

20              Colville & Associates

21                1309 E. Broadway

22             Tucson, AZ 85719-5824

23                 (520) 884-9041

24              FAX (520) 623-1681

25

EXHIBIT 29

1    Q.    There's nothing that indicated to you that

2  Dr. Lorber had omitted a type of analysis or applied the wrong

3  type of analysis when he was coming to his conclusion; is that

4  right?

5    A.    That's correct.

6          MS. KANON-USTARIZ:  Based on the records he

7  had at the time, right?

8    Q.    Yes, based on the records you had at the time.

9          And based on the records you subsequently

10  received, would your answer change?

11    A.    Based on the records I subsequently received?

12  Again, based on the records subsequently received, it showed,

13  if anything, it confirms my thoughts that he was a very, very

14  high-risk patient.  There was continued mention of alcohol

15  abuse, continued mention of bingeing.  Soon -- very soon after

16  he was discharged from employment, he had a major hypoglycemic

17  event at home, requiring paramedics.

18          So there are many things that I think confirm

19  what I say, that he is a very high-risk patient to drive or

20  not drive.

21    Q.    I'm not asking about that.  I'm asking whether or

22  not, based on all the evidence that you've now received, all

23  of the medical documentation, is there anything that made you

24  feel that Dr. Lorber's methodology in coming to his

25  conclusions were incorrect?

1    presume that it means that the patient is being noncompliant?

2        A.    That's correct.

3        Q.    I'm going to flip to Kalil MR00126, which is another

4    medical record for Mr. Nez which appears to be generated from

5    February 7th, '05.  At the top it says, "Emergency Visit

6    Record."  I tried to read this, and I have nondoctor eyes so I

7    couldn't make out a lot of what's written.  I know you didn't

8    generate it.

9                Were you able to read this document, all the

10   handwritten portions of it?

11       A.    Do you want me to read it?

12       Q.    Well, are you able to decipher the handwriting

13   there?

14       A.    Some but not all.

15       Q.    Is there any portion of that handwriting that you

16   can decipher as indicating Mr. Nez lost consciousness?

17       A.    It says he was confused and had a glucose of 48.

18   That's not loss of consciousness.  That's mental confusion

19   there.

20       Q.    Are you finished?

21       A.    Yes.

22       Q.    In your review of the medical documents for Mr. Nez,

23   did you find any medical records that indicated he did lose

24   consciousness at some point?

25       A.    What date is that?  February 7th?

72

1      Q.    Yes.

2      A.    On February 5th, there's a notation that his glucose

3  dropped to 29 then.

4      Q.    February 7th, you said?

5      A.    No.  I've got February 5th.  Again I wish I hadn't

6  taken this off.

7      Q.    I'm having a hard time locating a February 5th.

8      A.    February 6, '05.  February 6th, '05, finger stick 29

9  in the field.  Treated with intravenous D50.

10              Anything is possible, but most people at 29

11  are not conscious.

12     Q.    And that's what you concluded -- that's how you base

13  that he was unconscious?

14     A.    That's right.  He was not conscious enough that they

15  could give him something by mouth.  They had to give him

16  something intravenously.

17     Q.    How do you conclude that?

18     A.    That's why they gave him intravenous D50.  In the

19  emergency room even after that, his sugar was still very low,

20  and they gave him a second amp of intravenous D50.

21     Q.    And you said that's from a medical record of what

22  date?

23     A.    February 6th.

24     Q.    I'm unable to locate a February 6th medical record.

25     A.    Do you have one on February 7th?

EXHIBIT 29

73

1          MS. KANON-USTARIZ:  Here's one.

2     Q.    Here is one on the 7th, yes.

3     A.    Is this one that we just looked at or something

4  different?

5          MS. KANON-USTARIZ:  No.  It's different.

6     A.    This is, I think, the same one.

7     Q.    That's the same one?

8     A.    Yeah.  There's a mention of the paramedics going to

9  his --

10    Q.    But I'm just looking for mention of unconsciousness.

11    A.    Pardon me?

12    Q.    I'm just looking for medical documents evidencing

13  unconsciousness or loss of consciousness.  Is there any other

14  date that you believe a medical record reflects Mr. Nez losing

15  consciousness?

16    A.    No.  Mainly at that time.

17    Q.    All right.  I see you're flipping through your

18  binder, so if you find what you're referring to, a medical

19  record indicating Mr. Nez lost consciousness, please let me

20  know.

21    A.    Here's a note that says February 6, 37-year-old man

22  on insulin.

23    Q.    February 6th?

24    A.    February 6th, '05.  Confused.  EMS called.  Patient

25  unresponsive.

EXHIBIT 29

74

1      Q.    Okay.

2      A.    Blood sugar 29 in the field.  Gave one amp of D50.

3            So he was unresponsive then, with a glucose of

4      29.

5      Q.    Is that the same page we were looking at before?

6            No.  That's from February 6, '05?

7      A.    '05.

8      Q.    I only have -- I don't have that.  May I make a copy

9      of that?

10           Is this page what you're referring to when you

11     concluded that he lost consciousness?

12     A.    Yes.

13           MS. CHEN:  We can go off the record while we

14     get a copy.

15           (Marked for Identification:

16           Deposition Exhibit No. 6)

17     Q.    We have just marked Exhibit 6, which are the medical

18     records from February 6, '05, the only records that you relied

19     on to conclude that Mr. Nez lost consciousness; is that right?

20     A.    That's correct.

21     Q.    And it's based on a handwritten notation by the

22     treating personnel stating:  EMS called; patient unresponsive.

23     Is that correct?

24     A.    Correct.

25     Q.    I'm going to ask you to take a look at pages that

EXHIBIT 29

1

```
1              UNITED STATES DISTRICT COURT
                   DISTRICT OF ARIZONA
2

3     ----------------------------X

4     EQUAL EMPLOYMENT OPPORTUNITY      Case No.:
      COMMISSION,                       4:07-cv-488-TUC-CKJ
5
                   Plaintiff,
6
      v.
7
      KALIL BOTTLING CO., an Arizona
8     corporation,

9                  Defendant

10    ----------------------------X

11

12

13

              TELEPHONIC DEPOSITION TESTIMONY OF
14
                   DANIEL LORBER, M.D.
15
                   FLUSHING, NEW YORK
16
                   NOVEMBER 25, 2008
17

18

19

20

21

22    ATKINSON-BAKER, INC.
      COURT REPORTERS
23    (800) 288-3376
      www.depo.com
24
      REPORTED BY:  MARIA LUCARELLI
25    FILE NO.:  A20A7F7
```

1    four --

2              A.   The first has five bullets.  You

3    want me to pull up the second?

4              Q.   Yes.  I don't think there is a

5    major difference between the two.

6              A.   Okay.  Let me look (perusing).

7              Q.   The second -- would your second

8    report more accurately reflect your opinion?

9              A.   No, not necessarily.  Hang on a

10   second.  That's on a piece of paper across the

11   room again.  I guess I added -- I added a few --

12   yeah, but I -- there's -- there are -- you have to

13   add them together.  Where they overlap,

14   obviously.  It's an overlap, but -- but there is

15   some more information there about the pneumonia

16   and foot ulcers and the kidney disease -- the

17   kidney disease, I'm sorry, was in the first one

18   and pneumonia was not and the infected foot ulcers

19   were not in -- in the -- in the first one.  And I

20   think that I expanded on the eating and food

21   choices issue.

22             Q.   Well, let's start with walking.  It

23   says that:  "Mr. Nez was substantially limited

24   compared to the average person in walking."  How

25   was his ability to walk different from the average

1    person?

2            A.   Well, at some point in this

3    process, and I don't remember exactly what it was,

4    but he had foot ulcers.  One of the things that we

5    were told to do when you have foot ulcers is

6    basically stay off of your feet.  Plus he has

7    fairly significant swelling of his legs, which

8    makes it harder to walk.

9            Q.   Did he need to use any assisted

10   devices, such as a cane or walker?

11           A.   I don't remember.

12           Q.   Do you know if he was under any

13   order to use special footwear?

14           A.   I don't remember that either.

15           Q.   Do you know if any part of his feet

16   or lower legs were amputated at any point?

17           A.   Not that I remember.

18           Q.   Do you recall the distance he could

19   walk one way or the other?

20           A.   No.

21           Q.   Did you see in the records where

22   his physicians encouraged him to exercise?

23           A.   Not specifically.  That frequently

24   is the general recommendation for people with

25   diabetes, but I think it needs to be looked at in

1      the case of an individual who also has foot ulcers

2      and may or may not have significant swelling of

3      his legs.

4              Q.   Did he always have foot ulcers or

5      were they temporary?

6              A.   They were temporary and recurrent.

7              Q.   Was he under any orders to refrain

8      from walking?

9              A.   I honestly don't remember what's in

10     the record, but when you have ulcers of your feet,

11     they are usually on the underside of the foot and

12     the doctor usually says:  Stay off your feet until

13     they heal.  That would be the normal practice.

14             Q.   How long does it take them to heal?

15             A.   Tremendously variable.  It can be

16     from a few weeks to never.

17             Q.   That's in diabetic patients?

18             A.   Yes.

19             Q.   Do you know during the time he was

20     working at Kalil, was he under any restrictions

21     with respect to walking?

22             A.   I don't know.

23             Q.   When we talked about substantially

24     limited with Mr. Nez, that doesn't mean that he

25     couldn't do the activity at all, correct?

1              (Telephonic interruption.)

2         A.   Can we go off the record for a

3    minute so I could just respond to a text message

4    from my daughter?

5         Q.   Sure.

6         A.   Thank you.

7              MS. USTARIZ:  Off the record.

8              (Recess taken.)

9         Q.   Okay.  You mentioned avoiding

10   sweets, restricting carbohydrates and maybe

11   restricting salt and I'm wondering how that's

12   different than someone just trying to eat a

13   healthy diet.

14        A.   Carbohydrate restriction is not a

15   healthy diet.  Actually, as a matter of fact, it

16   tends to be higher in fat frequently, which is

17   always one of the downsides of the Atkins-type

18   diets.  Salt restriction is relevant if you have

19   hypertension or kidney disease, but it probably

20   doesn't -- or heart failure.  It probably doesn't

21   matter a whole lot for other people.  What's the

22   third one?  Salts, fats -- oh, carbohydrates and

23   sweets.  Carbohydrate and sweet restriction

24   neither.  Sweet restrictions is only relevant to

25   your dentist, so it's very different.

1          A.   Sure.

2          Q.   Do you know if that resolved, the

3     pneumonia?

4          A.   I do not.

5          Q.   If his doctor released him to go

6     back to work in a few days, would you believe that

7     it was resolving?

8          A.   It would seem logical.

9          Q.   Do you know if Mr. Nez experienced

10    breathing difficulties upon the slightest

11    exertion?

12         A.   I don't know how to define that.

13         Q.   What would cause him to experience

14    breathing difficulty?

15         A.   Well, when you've got heart

16    failure, one of the things that happens is that

17    you accumulate small amounts of fluid in between

18    the air spaces in your lungs.  It makes your lungs

19    stiffer and so stiff lungs make you feel more

20    short of breath.  In addition of which when you

21    exercise -- you know, for somebody with a normal

22    heart function who exercises, they increase

23    their -- what's called cardiac output, the actual

24    pumping function of the heart and heart failure,

25    that's limited and once again you deal with the

1    fact that you're just not getting enough

2    oxygenated blood to your cells in your brain and

3    so that is a shortness of breath.  Whether

4    that's -- I don't know the exact phrasing you

5    used.

6              Q.    Slightest exertion.

7              A.    I don't know what the "slightest

8    exertion" means.  It's not a medical term.

9              Q.    Do you think that lifting the

10   drinks and building displays could cause him to be

11   short of breath?

12             A.    I -- I'd be guessing and I'd rather

13   not guess.

14             Q.    Sure.  Do you believe that there

15   was some point that Mr. Nez was no longer able to

16   do what meets his job requirements from Kalil?

17             A.    Certainly.

18             Q.    Why do you believe that would?

19             A.    He's dead, isn't he?

20             Q.    Well, yes.

21             A.    That's a substantial limitation.

22             Q.    I would think so.  I agree with you

23   there.

24             A.    But presumably, you know, and

25   again, I don't know the circumstances of his

EXHIBIT 30

1

1              IN THE UNITED STATES DISTRICT COURT

2                IN AND FOR THE DISTRICT OF ARIZONA

3

4      EQUAL EMPLOYMENT OPPORTUNITY      )
       COMMISSION,                       )
5                                        )
                    Plaintiff,           )
6                                        )
              vs.                        )      No. CIV 07-488-TUC-BPV
7                                        )
       KALIL BOTTLING CO., an Arizona    )
8      corporation,                      )
                                         )
9                   Defendant.           )
       _____  )

10

11

12

13          TELEPHONIC DEPOSITION OF STEPHEN McCULLOUGH

14

15

16                      Phoenix, Arizona
                   Wednesday, December 3, 2008
17                        10:26 a.m.

18

19

20

21     REPORTED BY:
       Kristin A. Woodall, RPR
22     Certified Court Reporter
       Certificate No. 50196

23

24     PREPARED FOR:
       ASCII
25     (Copy)

6

1    October.

2              Q.    Did you call Mr. Nagore by phone?

3              A.    Yes.

4              Q.    And you're a former coworker of Mr. Nagore's?

5              A.    Yes.

6              Q.    How long did you talk to Bob Nagore?

7              A.    Probably for about five minutes.

8              Q.    How many times have you talked to Bob Nagore

9    since October 24th?

10             A.    Just once as far as I know.

11             Q.    What did you say to Mr. Nagore?

12             A.    I asked him who's Gerald Nez.

13             Q.    And what did Mr. Nagore say?

14             A.    He told me it was an employee I had working for

15   me in Flagstaff.

16             Q.    Did he describe Mr. Nez in any other way?

17             A.    You mean as far as?

18             Q.    What else did he say about Mr. Nez?

19             A.    He said that Mr. Nez had a problem with diabetes

20   and that that's what this whole thing was about, that we

21   wouldn't put him to work because of -- or we wouldn't let him

22   do his job because he had full-blown diabetes.  He also told me

23   Gerald Nez died last year or sometime.

24             Q.    Mr. Nagore told you that Kalil wouldn't let

25   Mr. Nez work because of his diabetes?

EXHIBIT 31

7

1          A.    No.   I asked him to fill me in on what's going on

2   and he just said that it's something to do with we had him

3   working in Tuba City I think as a merchandiser, and he never

4   had a physical.   So we made him take his physical and he had

5   diabetes.   So we couldn't -- until he got that under control,

6   we couldn't let him perform his job until he got that under

7   control.

8          Q.    Do you know if Mr. Nez ever worked as a

9   merchandiser in Flagstaff?

10         A.    Nez, it doesn't ring a bell.   I have about -- I

11   had about 75 employees, and even going through my phone list, I

12   only recognize about 25 or 30 that I could put a face to.   I

13   basically -- I didn't meet a lot of our employees.   A lot of

14   them lived out of town.   I didn't do all the hiring, and I

15   don't remember a Gerald Nez.

16         Q.    Okay.   Do you remember --

17         A.    I told Bob this and he said, well, he worked for

18   you.   And I said, well, Bob, you know, I don't remember him.

19         Q.    Let me just exhaust my questions about your

20   conversation with Mr. Nagore for a moment so we can move on to

21   a different topic.

22         A.    All right.

23         Q.    Do you remember if Mr. Nagore told you anything

24   else about Mr. Nez or what happened to him?

25         A.    He was a former employee and had diabetes and we

EXHIBIT 31

8

1    had to pull him off until he could get his diabetes under

2    control or something to that extent.  That was it.

3         Q.   Did he tell you -- did Mr. Nagore tell you what

4    position Mr. Nez held?

5         A.   I think he said merchandiser in Tuba City.

6         Q.   Did Mr. Nagore indicate whether or not Mr. Nez

7    held any other position for Kalil other than merchandiser?

8         A.   I think he said that we -- yes, yes.  He said

9    that when we pulled him off being a merchandiser, we could work

10   him in the warehouse until he got his diabetes under control.

11   In the warehouse, there's no -- nothing required basically to

12   work in the warehouse as far as a physical or anything like

13   that.

14        Q.   Do you remember whether Mr. Nagore indicated who

15   made the decision, if the decision was made at all, to move

16   Mr. Nez to the warehouse?

17        A.   He says that we made it jointly, that I was part

18   of that decision.

19        Q.   But you don't recall that sitting here today, do

20   you?

21        A.   No, I do not.  Not to say it couldn't have

22   happened.  I've had a lot of phone calls, you know, conference

23   calls about stuff over the years, and I don't remember it.

24        Q.   Okay.  Do you remember anything else Mr. Nagore

25   told you about Mr. Nez or the situation?

EXHIBIT 31

Mary Jo O'Neill, AZ Bar No. 005924
P. David Lopez, DC Bar No. 426463
T. Diana Chen, AZ Bar No. 021706
Equal Employment Opportunity Commission
3300 N. Central Ave., Suite 690
Phoenix, AZ 85012-2504
Telephone: 602-640-5016
Fax: 602-640-5009

E-Mail:
mary.Oneill@eeoc.gov
patrick.Lopez@eeoc.gov
diana.Chen@eeoc.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> KALIL BOTTLING CO., <br><br> Defendant. | No. CIV 07-488-TUC-CKJ <br><br> **DECLARATION OF SHIRLEY SUTTER** |

I, Shirley Sutter, declare and state as follows:

1.      I married Gerald Nez in March 9, 1990.  Gerald had diabetes when we were married.

2.      We had been married more than 17 years when he died in 2007. During our marriage, we lived together for the entire time, including the period he worked for Kalil.

3.      At all times, Gerald carried some form of hard candy with him, in the event that his blood sugar should suddenly drop to dangerous levels.

4.      When Gerald's glucose levels dropped, he would be faint, lose his balance, lose his footing, become confused, and shake.  Immediately when he felt these symptoms, he would eat a hard candy to try to recover.  Sometimes, the hard candy was not enough and he would have to eat something else like a candy bar.  I observed this episodes many times throughout our marriage.

5.      During the time he worked at Kalil, I observed that Gerald could not climb from one floor of a building to the next floor without stopping mid-flight to rest because he would become breathless like someone who had been running. Gerald would hold on to a handrail and pause for about 2 minutes to catch his breath before continuing and reaching the next floor.

6.      During the time he worked at Kalil, I observed that Gerald would get breathless, like someone who had been running, whenever he lifted 2-3 cases of soda.  He would then have to stop lifting for several minutes before he could resume lifting again.

7.      During the time he worked at Kalil, Gerald was prescribed special insoles to insert into his shoes due to neuropathy.  We purchased these from a medical supply store and I observed Gerald using the insoles in the shoes he wore.

8.      During the time he worked at Kalil, Gerald had difficulty walking. Gerald could keep a normal walking pace for a few minutes, after which he could only walk slowly and take smaller steps.  After walking about 100 feet, he would have to stop and catch his breath for about 2-3 minutes and bend down and rests

his hands on his knees before continuing to walk again.  Sometimes, Gerald would

lean on me.

   I declare under penalty of perjury that the foregoing is true and correct.


**February 6, 2009**        **s/Shirley Sutter**
  Date           Shirley Sutter