1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Equal Employment Opportunity Commission<br><br>            Plaintiff,<br><br>vs.<br><br>Kalil Bottling Co., an Arizona corporation,<br><br>            Defendant. | No.   CV 07-0488-TUC-BPV<br><br>**ORDER** |

Presently pending before the court are cross-motions for Summary Judgment and Partial Summary Judgment by Plaintiff, Equal Employment Opportunity Commission (EEOC) and Defendant, Kalil Bottling Company,  pursuant to Rule 56,  Federal Rules of Civil Procedure.

All parties in this case have consented to proceed, pursuant to 28 U.S.C. § 636(c), before Magistrate Judge Velasco for all proceedings in this case, including trial and entry of final judgment, and to conduct all post-judgment proceedings, with direct review by the Ninth Circuit Court of Appeals if an appeal is filed.

Regarding the Plaintiff's claims for Summary Judgment, the Magistrate Judge orders that Summary Judgment be DENIED on the issue of whether Gerald Nez was a qualified person with a disability at all relevant times and on the issue of whether Defendant's affirmative defenses are factually and legally insufficient. Partial Summary Judgment is GRANTED on the issue of whether Nez was terminated purely because he failed a Department of Transportation medical examination.

In reference to the Defendant's motions for Summary Judgment, Summary Judgment is DENIED on the issue of whether Gerald Nez was disabled as defined by the Americans with Disabilities Act and on the issue of intentionality.

## STATEMENT OF FACTS

The EEOC is representing Gerald Nez, a type 2 insulin-dependant diabetic, who was discharged from his job with Kalil Bottling Company on or about February 1, 2004. Nez was hired by Kalil as a merchandiser in August 2004. (PSOF ¶ 4; DSOF ¶ 5, 8, 10). The position of merchandiser required that Nez drive his own Mazda pick-up truck to deliver soft drinks to retailers. (PSOF ¶ 4-5; DSOF ¶ 6-7). Nez's hiring was contingent upon passing a drug test and a Department of Transportation (DOT) physical exam. (DSOF ¶ 8). Nez was inadvertently administered a routine physical exam rather than the DOT exam. (DSOF ¶ 9). Nez passed the routine physical exam and was hired.(DSOF ¶ 10). In January 2005, Kalil realized that Nez had not taken the correct physical exam. (DSOF ¶ 11). Nez was then requested to take the DOT physical. (PSOF ¶ 6; DSOF ¶ 11). Nez failed the DOT physical because he was an insulin dependant diabetic. (PSOF ¶ 10; DSOF ¶ 12). Being an insulin-dependant diabetic is an absolute preclusion from passing the DOT physical.(PSOF ¶ 13). Nez was then terminated from his position as a merchandiser with Kalil.(PSOF ¶ 11, 12). The reason for his termination was stated as "unable to pass required physical."(PSOF ¶ 12).

During his time with Kalil, Nez performed the duties of a merchandiser without incident.(PSOF ¶ 114). He drove his own small Mazda pickup and delivered soft drinks to retail stores. (PSOF ¶4-5). In the five month period that he worked for Kalil, Nez was given two pay raises. (PSOF ¶ 74, 75). Other than failing the DOT physical exam, Nez satisfied the essential functions of the merchandiser position. (PSOF ¶ 18).

As a result of his diabetes, Nez suffered from diabetic neuropathy, congestive heart failure, and hypertension. (PSOF ¶ 122, 123; DSOF ¶ 16).

1    Sometime during the early 1970's Kalil established a policy of requiring that all
2    employees who would be driving either their own or a company vehicle pass the DOT
3    physical exam required for a commercial driver's license, regardless of the size of their
4    vehicle, their individual medical history or their individual driving history. (PSOF ¶ 2,
5    95; DSOF ¶ 2). Kalil instituted the policy of requiring the DOT physical exam as part
6    of group of changes in policy designed to reduce accidents and insurance costs.(PSOF
7    ¶ 95; DSOF ¶ 3). Kalil's choice of the DOT test was not required by their insurance
8    company or any federal, state or local ordinance. (PSOF ¶ 8, 92; DSOF ¶ 3, 4).

9                                         **DISCUSSION**

10   I.    Standard of Review

11   Federal Rule of Civil Procedure 56(c) provides that a court may grant summary
12   judgment if "the pleadings, depositions, answers to interrogatories, and admissions on
13   file, together with the affidavits, if any, show that there is no genuine issue as to any
14   material fact and that the moving party is entitled to judgment as a matter of law." Fed.
15   R. Civ. P. 56(c). A party seeking summary judgment must identify those parts of the
16   record that indicate the absence of a genuine issue of material fact. *Celotex Corp. v.*
17   *Caltrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255
18   (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574
19   (1986). Once the moving party has made this showing, the nonmoving party must
20   designate which specific facts show that there is an issue for trial. *Celotex*, 477 U.S.
21   at 324 (citing Fed. R. Civ. P. 56(e)). The moving party is held to a strict standard, and
22   any doubts about the existence of a genuine issue of material fact will be resolved
23   against it. *Eastman Kodak Co. v. Image Technical Servs.*, Inc., 504 U.S. 451, 456
24   (1992).

25   Under Fed. R. Civ. P. 56(e), in response to a properly supported motion for
26   summary judgment, the opposing party "must set forth specific facts showing that there
27   is a genuine issue for trial." The inquiry performed by the trial court is to determine

28                                          - 3 -

1  whether there are "any genuine factual issues that properly can be resolved only by a
2  finder of fact because they may reasonably be resolved in favor of either party."
3  *Anderson*, 477 U.S. at 250.  For an issue to be "genuine," there must be evidence such
4  that a "reasonable jury" could reach a verdict in favor of the nonmoving party. *Id.* at
5  248.

6       As to what may be properly considered a genuine issue of fact, "[w]hen a
7  respondent to a motion for summary judgment submits proper affidavits by individuals
8  with personal knowledge and other cognizable and significantly probative evidence,
9  such that a reasonable juror drawing all inferences in favor of the respondent could
10 return a verdict in the respondent's favor, the judge must treat that fact as genuinely at
11 issue." *United States v. Shumway*, 199 F.3d 1093, 1103 (9th Cir.1999).  Moreover,
12 "[t]he possibility that other inferences could be drawn that would provide an alternate
13 explanation for the [defendant's] actions does not entitle them to summary judgment."
14 *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1303 (9th
15 Cir.1999).  "The mere existence of a scintilla of evidence in support of the plaintiff's
16 position will be insufficient; there must be evidence on which a reasonable jury could
17 reasonably find for plaintiff." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).
18 The evidence of the nonmovant is to be believed, and all justifiable inferences are to be
19 drawn in his favor. *Id.* at 248; *Tokio Marine & Fire Ins. Co., Ltd. v. Kaisha*, 25 F.
20 Supp. 2d 1071, 1076 -1077 (C.D. Cal. 1997).    With these standards firmly in mind,
21 the Magistrate Judge turns to the merits of Plaintiff's and Defendant's cross-claims.

22 II.    Introduction

23       The EEOC alleges  that Gerald Nez was a qualified disabled person under 42
24 U.S.C. § 12102(1) and that  Kalil has violated Title I of the Americans with Disabilities
25 Act (ADA) by employing a discriminatory job qualification standard and terminating
26 the employment of  Nez because he was an insulin dependant diabetic.

27
28                                    - 4 -

1    To qualify for relief under the ADA, the EEOC must show that Nez: (1) is a
2  disabled person within the meaning of the statute; (2) is qualified, with or without
3  reasonable accommodation, to perform the essential functions of the job held; and (3)
4  suffered an adverse employment action because of his disability. Americans with
5  Disabilities Act of 1990 §2 *et seq*, 42 U.S.C.A. § 12101 *et seq*.

6    The EEOC has requested that the court find as a matter of law that: (1) Gerald
7  Nez was a qualified person with a disability at all relevant times; (2) Defendant
8  terminated Nez purely because he failed a Department of Transportation medical
9  examination; and (3) Defendant's affirmative defenses are factually and legally
10  insufficient.

11    Kalil Bottling Company moves for summary judgment on the grounds that the
12  employee, Gerald Nez, was not disabled as defined under the American with
13  Disabilities Act (ADA) or, alternatively, for partial summary judgment on the issue of
14  intentionality and asserts that any alleged discrimination was not intentional "disparate
15  treatment" discrimination, but was "disparate impact" discrimination as the result of a
16  policy that tends to screen out qualified individuals with disabilities.

17  III.   Genuine issues of material  fact exist as to whether Gerald Nez was a qualified
18       person with a disability at all relevant times.

19    **A.    Nez was qualified for the position in question.**

20    Nez was qualified for the position of merchandiser. The ADA defines a
21  "qualified" individual as being an individual who, with or without reasonable
22  accommodation, can perform the essential functions of the employment position that
23  such individual holds or desires. 42 U.S.C. § 12111(8).  Essential functions mean the
24  fundamental job duties of the employment position and do not include the marginal
25  functions of the position. 29 C.F.R. § 1630.2(n)(1).  In addition the individual must
26  meet "the requisite skill, experience, education and other job-related requirements of

27
28                                        - 5 -

1   the position." *Bates v. United Parcel Service*, 511 F.3d 974, 990 (9th Cir. 2007) (*en*

2   *banc*).

3       The statute does not require that a person meet each of an employer's
        established 'qualification standards,' however, to show that he is
4       "qualified." And, indeed, it would make little sense to require an ADA
        plaintiff to show that he meets a qualification standard that he
5       undisputedly cannot meet because of his disability and that forms the
        very basis of his discrimination challenge."
6
7   *Id*. Although the plaintiff bears the ultimate burden of persuading the fact finder that

8   he can perform the job's essential functions, if the "employer disputes the plaintiff's

9   claim that he can perform the essential functions, he must put forth evidence

10  establishing those functions. *Id*. (quoting *EEOC v. Wal-Mart*, 477 F.3d 561, 568 (8th

11  Cir.2007)).

12      In *Rohr v. Salt River Agric. Improvement & Power Dist.*, 555 F.3d 850, 862 (9th

13  Cir. 2009), the Ninth Circuit found that if an employer used a qualification standard

14  that tended to screen out an individual with a disability, the employer bears the burden

15  of proving that the challenged standard is "job-related" and "consistent with business

16  necessity." "[A]n employer may not turn every condition of employment which it elects

17  to adopt into a job function, let alone an essential job function, merely by including it

18  in a job description.." *Echazabal v. Chevron USA, Inc.*, 226 F.3d 1063, 1071 (9th

19  Cir.2000).

20      As in *Rohr*, "this is not a case where an employer merely implemented the

21  medical certification program required by a federal agency," *Rohr*, 555 F.3d at 863.

22  The DOT physical is required by the DOT for a commercial driver's license for

23  individuals wishing to drive vehicles in excess of 10,000 lbs or which are used to

24  transport hazardous materials or more than 15 passengers. 49 C.F.R. § 350.105.

25  Merchandisers with Kalil drive either their own vehicles or small Chevy Colorado

26  pick-ups owned by Kalil which weigh less than 10,000 lbs. (PSOF ¶ 3). Kalil was not

27  mandated by either the United States Department of Transportation or the Arizona

28                                          - 6 -

1  Department of Transportation to adopt the DOT standards or to require Nez to pass a
2  physical exam before he could be employed as a merchandiser.  (PSOF ¶ 8).  Kalil did
3  not present any evidence which indicated that passing the DOT physical was essential
4  to the position of merchandiser. The "Job Analysis" for the merchandiser position
5  presented as evidence by Kalil lists the "specific experience or skills required" as: drive
6  own vehicle, able to lift 0-75 pounds and able to count cases; for licenses or
7  certification required: drivers license, vehicle insurance, DOT physical-pass; and under
8  "essential job functions": safe driving, stock shelves, keeping back stock right, and
9  build displays. (Doc. 65, Ex. F).

10      Kalil does not dispute that Nez was qualified for the position of merchandiser
11  except for his inability to pass the DOT physical.  The DOT physical was not required
12  by any federal, state or local statute and was voluntarily adopted by Kalil.  The ability
13  to pass the DOT physical is not an essential requirement of the merchandiser position.
14  Since Nez met the essential requirements of the merchandiser position, he was a
15  qualified individual under the ADA.

16      **B.      An issue of fact exists as to whether Nez was disabled as defined by**
17           **the ADA.**

18      In order to be disabled under the Americans with Disabilities Act (ADA), the
19  EEOC must show that, at the time of the adverse employment action,  Nez suffered
20  from a physical impairment that substantially limited him in one or more major life
21  activities. 42 U.S.C.A. § 12102(1)[1].

22

23  _____

    **[1]Retroactive Application of the ADA Amendments Act of 2008**
24          In September 2008 the ADA Amendments Act of 2008 (ADAAA) was
    signed into law in order "[t]o restore the intent and protections of the American
25  with Disabilities Act of 1990." Pub.L.   No. 110-325, 122 Stat. 3553 (2008).
    The ADAAA rejects the Supreme Court's interpretation of the term "disability"
26  in Sutton, 527 U.S. 471 and expands the class of individuals who are entitled
27  to protection under the ADA. Id. § 2(b), 122 Stat. at 3553.

28

1          1.     Nez suffered from a physical impairment.

2          There is no dispute that Nez's suffered from a physical impairment.  Nez was

3  an insulin-dependent diabetic at the time of his termination by Kalil.  EEOC regulations

4  define "physical impairment" as any condition affecting one or more of the following

5  body systems: neurological, musculoskeletal, respiratory, cardiovascular, or endocrine.

6  29 C.F.R. § 1630.2  Diabetes is a physical impairment because it affects the digestive,

7  _____

8          In determining whether to apply the new standard of the ADA to the
9          Plaintiff's claims,  the court first examines whether the ADA Amendment
           would apply retroactively. The majority of cases in the Ninth Circuit have held
10         that the ADA does not apply retroactively: When a case implicates a federal
           statute enacted after the events alleged in the action, the court will not apply
11         the new statute where it would have retroactive effect  (*i.e.*, where it would
12         increase a party's liability for past conduct or impose new duties with respect
           to transactions already completed) absent clear congressional intent favoring
13         retroactivity. *See  Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994);
14         *Scott v. Boos*, 215 F.3d 940, 944 (9th Cir.2000) (noting that *Landgraf* relies
           upon the "familiar considerations of fair notice, reasonable reliance, and settled
15         expectations [to] offer some guidance in determining retroactive effect"
16         (quotation and citation signals omitted)); see also *Bradley v. Sch. Bd. of City
           of Richmond*, 416 U.S. 696, 720  (1974) (noting retroactive application is
17         inappropriate where "new and unanticipated obligations may be imposed upon
18         a party without notice or an opportunity to be heard"); *DeGurules  v. I.N.S.*,
19         833 F.2d 861, 863-64 (9th Cir.1987) (stating new law will not be applied
           retroactively where the law creates "the possibility that new and unanticipated
20         obligations [might] be imposed on a party without notice or an opportunity to
           be heard"). *Thorn v. BAE Systems Hawaii Shipyards, Inc.*, 2009  WL 274507,
21         1 -2 (D. Hawaii). *See also Burkhart v. Intuit, Inc.*, 2009 WL 528603 (D. Ariz.);
22         *Garcia v. Qwest Corp.*, 2008 WL 5114317 (D. Ariz.); *Neal v. Kraft Foods
           Global, Inc.*, 2009 WL 799644, (D. Or.); *Toungate v. Konica Minolta Business
23         Solutions, USA, Inc.*, 2009 WL 596597 (W.D. Wash.). *Cf.  Menchaca v.
24         Maricopa Community College Dist.*, 595 F.Supp.2d 1063 (D. Ariz. 2009) (no
           statement of retroactivity, but case decided using the new standard).
25         Application of the ADA Amendment to this case would cause a
26         retroactive effect by placing a new requirement upon Defendant of which he
           could not have been aware at the time.  In declining to apply the ADAAA
27         retroactively this court joins with the majority of courts in the Ninth Circuit.

28                                    - 8 -

1  hemic and endocrine systems. *Rohr*, 555 F.3d at 858.  In *Fraser v. Goodale*, 342 F.3d

2  1032 (9th Cir. 2003), the court held that diabetes is a "physical impairment" under the

3  ADA.  In addition, Nez suffered from congestive heart disease and diabetic neuropathy.

4         2.      <u>Genuine issues of material fact exists as to whether Nez was</u>

5                <u>substantially limited in a major life activity.</u>

6        The EEOC alleges that Nez was substantially limited in the major life activities

7  of eating, walking, breathing and insulin production.  The EEOC has produced medical

8  records, expert testimony and testimony from Nez's wife to establish the limitations that

9  Nez suffered in the major life activities of eating, walking, breathing .and insulin

10  production.

11                a.    *Major Life Activities*

12        Under 29 C.F.R. § 1630.2(i), major life activities are defined as "functions such

13  as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking,

14  breathing, learning, and working." Walking and breathing are major life activities as a

15  matter of law. In *Fraser*, 342 F.3d at 1040, the Ninth Circuit  held that eating could be

16  a major life activity and, specifically, that the dietary control necessitated by the

17  diabetic condition affects the major life activity of eating. *See also Rohr*, 555 F.3d at

18  859.

19        The EEOC's contention that secreting insulin is a major life activity is supported

20  by *Herman v Kvaerner of Philadelphia Shipyard, Inc.*, 461 F. Supp. 2d 332, 336 (E.D.

21  Pa. 2006), where it was suggested that the secretion of insulin sufficient to process

22  blood glucose was a major life activity as a matter of law.  In *Sutton v. United Air Lines,*

23  *Inc.*, 527 U.S. 471, 483 (1999), however, the Supreme Court rejected a hypothetical

24  premise wherein all diabetics are *per se* disabled, adding that those diabetics whose

25  diabetes does not impair their daily activities should not be considered disabled under

26  the ADA.  Since all diabetics, by definition, lack sufficient insulin to process blood

27

28

glucose, and are therefore substantially limited in terms of insulin production, it follows from this that the secretion of insulin can not be a major life activity *as a matter of law*.

b. *Substantially Limited*

Substantially limited means:

(I)    Unable to perform a major life activity that the average person in the general population can perform; or

(ii)    Significantly restricted as to the condition manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform the same major life activity.

29 C.F.R. § 1630.2(j). In deciding whether Nez's impairment is substantially limiting we must consider the nature and severity of the impairment, the duration or expected duration of the impairment as well as the permanent or long term impact of the impairment. 29 C.F.R. § 1630.2. In addition, the effect of mitigating measures must be considered when determining whether an individual is disabled. "[I]f a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures-both positive and negative-must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus "disabled" under the Act." *Sutton*, 527 U.S. at 482.

The case law of the United States Supreme Court and the Ninth Circuit establishes that the determination of whether someone is disabled is a highly fact-intensive and individualized inquiry. *See Sutton*, *supra*, and *Rohr, supra*.

The definition of disability requires that disabilities be evaluated "with respect to an individual" and be determined based on whether an impairment substantially limits the "major life activities of such individual." 42 U.S.C. § 12102(2). Thus, whether

- 10 -

1  a person has a disability under the ADA is an individualized inquiry. *Id.* at 483. "The

2  determination of whether an individual has a disability is not necessarily based on the

3  name or diagnosis of the impairment the person has, but rather on the effect of that

4  impairment on the life of the individual." 29 C.F.R. pt. 1630, App.§ 1630.2(j).

5  Determining the severity of impairment necessary to constitute a disability is a fact

6  intensive inquiry and should be left to the trier of fact.

7        Although the EEOC has presented evidence that Nez was limited in the major

8  life activities of breathing, walking, and eating, Kalil has produced testimony and

9  medical records which argue that Nez was not limited beyond the limitations

10  experienced by many people in the population. A genuine issue of material fact exists

11  as to whether Gerald Nez was substantially limited in a major life activity.

12  IV.    <u>Gerald Nez was terminated because he failed to pass the DOT physical</u>.

13        The EEOC asserts that Nez was terminated from his job as a merchandiser when

14  he failed to pass the DOT physical which Kalil mandated for all employees whose job

15  description included driving.  Kalil rebuts this assertion and claims that when he failed

16  the DOT physical Nez was offered a temporary job in their warehouse with the

17  intention that he would retake the DOT exam in 30 days and pass it. Kalil contends that

18  Nez walked off the warehouse job after a few days and was terminated due to "no

19  call/no show."

20        The "Claimant Quality Control Wage Verification" form that Kalil submitted to

21  the Arizona Department of Economic Security in response to Nez's claim for

22  unemployment benefits stated that "the reason for separation" was "unable to pass

23  required physical." (PSOF 12, Ex. 15).  According to the EEOC, the Internal Status

24  Change form used by Kalil states that the reason for termination is: "Employee did not

25  pass the required DOT physical." (PSOF 75). (This form is not included in the

26  documents filed by the EEOC.)  In answers to interrogatories, Kalil admitted that Nez

27  was terminated for failure to pass the DOT physical exam. (Doc. 66-2, Ex. 1, ¶ 16).

28

1    Kalil contends that Nez was removed from his position as a merchandiser on
2  January 26, 2005 and given a temporary job in the warehouse.  Kalil  presented time
3  sheets showing that Nez was employed through January 31, 2005.  The time sheets do
4  not indicate that  Nez was working in the warehouse.  The employment position
5  indicated on the time sheets is that of 'merchandiser.'  Kalil admits that the change of
6  status form dated February 1, 2005 indicates the separation date was February 1, 2005
7  and that the reason for the termination was "employee did not pass required physical."
8  The only evidence that Kalil presented that supports its contention that Nez was offered
9  a temporary position in the warehouse is the deposition of  Bob Nagore who contends
10  that he offered Nez a temporary job in the warehouse beginning January 27, 2005.
11  Other than Nagore's deposition, Kalil presented no evidence to prove that Nez was
12  terminated for any reason other than failure to pass the DOT physical.

13    Insulin dependant diabetes is an absolute disqualification from passing the DOT
14  physical exam. 49 C.F.R. §391.41(b)(3).  A person is physically qualified to drive a
15  commercial motor vehicle if that person "has no established medical history or clinical
16  diagnosis of diabetes mellitus currently requiring insulin for control." Id. "[T]he
17  FMCSA [Federal Motor Carrier Safety Administration]  has consistently held that a
18  diabetic who uses insulin for control does not meet the minimum physical requirements
19  of the FMCSRs.[Federal Motor Carrier Safety Regulations]. " *Id.*

20    Gerald Nez could not pass the DOT exam so long as he was an insulin using
21  diabetic.  Kalil terminated Nez from his job as a merchandiser due to his failure to pass
22  the DOT physical exam.  Kalil may or may not have offered Nez a temporary position
23  in the warehouse, but, if Nez's ability to retain a permanent position with Kalil, was
24  dependant on passing the DOT physical, there was no possibility of Nez  retaining his
25  employment with Kalil.

26
27
28                                          - 12 -

1   Kalil has failed to produce evidence which would lead a reasonable finder of fact
2   to believe that Nez was terminated for any reason other than failing to pass the DOT
3   physical exam.

4   V.   <u>Not all of the defendant's affirmative defenses are factually and legally</u>
5       <u>insufficient.</u>

6       A.   **Kalil's affirmative defenses of laches, waiver and estoppel, statute of**
7            **limitations and failure to state a claim on which relief can be granted**
8            **are factually insufficient.**

9   There is no factual evidence in the record to support Kalil's affirmative defenses
10  of laches, waiver and estoppel, statute of limitations, and failure to state a claim on
11  which relief can be granted.

12      B.   **Kalil has not waived the affirmative defenses of direct threat and**
13           **business necessity by failing to include them in its Answer.**

14  Although Kalil did not raise the affirmative defenses of direct threat and business
15  necessity in its answer, the EEOC was not prejudiced by this failure because the
16  defenses were raised in the Case Management Plan and were clearly indicated as
17  defenses which would be raised to the EEOC's allegations discrimination.

18  Federal Rule of Civil Procedure 8(c) requires parties to raise every affirmative
19  defense in the first responsive pleading. Defenses not so raised are deemed waived. See
20  Fed. R. Civ. P. 8(c); Fed. R. Civ. P. 12(b); Fed. R. Civ. P. 12(g). The Ninth Circuit has
21  liberalized the requirement that defendants must raise affirmative defenses in their
22  initial pleadings. *See Magana v. N. Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir.
23  1997); *Tokio Marine*, 25 F. Supp. 2d at 1077. The determination of whether a defense
24  has been waived is left to the discretion of the trial court. *In re Kleinoeder*, 54 B.R. 33,
25  35 (B.R.N.D. Ohio 1985).  In determining whether a failure to raise a defense in the
26  answer should constitute a waiver, the court considers:

27

28                                    - 13 -

1   1) the obviousness of the defense's availability, 2) the stage of the proceeding at which

2   the defense is raised, 3) the time which has elapsed between the filing of the answer and

3   the raising of the defense, 4) the amount of time and effort expended by the plaintiff in

4   the case at the time the defense is raised, and 5) the prejudice resulting to the plaintiff

5   which would result from allowing the defense to be asserted.  *In re Santos*, 112 B.R.

6   1001, 1008 (9th Cir. BAP 1990).

7   　　　Here the defenses were raised in the Case Management Plan and are specifically

8   mentioned in 42 U.S.C.A. § 12112(b)(6) as possible defenses to an allegation of

9   discrimination.  In addition, the EEOC has raised objections to these defenses in its

10  motion for summary judgment, so is clearly aware and prepared to rebut these defenses.

11  Since no prejudice to the EEOC will arise in permitting these affirmative defenses of

12  business necessity and direct threat, the defendants  should be allowed to plead these

13  defenses.

14  　　　　　　1.　　Business Necessity

15  　　　Genuine issues of fact exist as to whether Kalil's adoption of DOT physical

16  examination for all drivers was motivated and justified by business necessity.  An

17  employer can defend against a disability discrimination claim under the ADA by

18  relying on a qualification standard that "is shown to be job-related for the position in

19  question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). Under 42

20  U.S.C. § 12112(b)(6), the employer has the burden of proving that its discriminatory

21  qualification standards satisfy the ADA's business necessity defense. Americans with

22  Disabilities Act of 1990, § 102(b)(6);  § 12112(b)(6).

23  　　　　　[W]hen an employer asserts a blanket safety-based qualification
　　　　　　　standard-beyond the essential job function-that is not mandated by law
24  　　　　　and that qualification standard screens out or tends to screen out an
　　　　　　　individual with a disability, the employer-not the employee-bears the
25  　　　　　burden of showing that the higher qualification standard is job-related
　　　　　　　and consistent with business necessity, and that performance cannot be
26  　　　　　achieved through reasonable accommodation.

27

28  　　　　　　　　　　　　　　　　- 14 -

1   *Bates*, 511 F.3d at 992 -993 (citing 42 U.S.C. § 12113(a)); *see also Rohr*, 555 F.3d at
2   862 (9th Cir. 2009).  The "business necessity" standard is quite high, and "is not [to be]
3   confused with mere expediency." *Cripe v. City of San Jose*,  261 F.3d 877, 890 (9th Cir.
4   2001) (citing *Bentivegna v. United States Dep't of Labor*, 694 F.2d 619, 621-22 (9th
5   Cir.1982)).  Furthermore, the employer must demonstrate that the qualification standard
6   is necessary and related to "the specific skills and physical requirements of the
7   sought-after position." *Id.* (citing *Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946, 951 (8th
8   Cir.1999)).

9         The EEOC alleges that the DOT physical exam required by Kalil for the
10   merchandiser position is not justified by business necessity since the test was designed
11   by the DOT specifically for those driving vehicles in excess of 10,000 pounds or
12   carrying more than 15 passengers or hazardous materials, while the merchandisers at
13   Kalil drove small pick-up trucks of approximately 4000 pounds. Kalil defends its use
14   of the DOT test as part of an overall plan instituted over 30 years ago to reduce accident
15   and insurance premiums among its drivers. Kalil points to the reduction in accidents
16   and insurance premiums which occurred after the adoption of this plan as justification
17   for the business necessity of the DOT physical exam.

18         Genuine issues of fact exist on the issue of whether the adoption of the DOT
19   physical is justified by business necessity.

20               2.    Direct Threat

21         Kalil has failed to present sufficient evidence to raise a question of fact as to
22   whether Gerald Nez presented a direct threat to the safety of those around him.  Under
23   the ADA, the term direct threat means a significant risk to the health or safety of others
24   that cannot be eliminated by reasonable accommodations. 42 U.S.C. § 12111(3). The
25   factors to be considered when determining whether an individual poses a direct threat
26   include:

27         (1) the duration of the risk;

28                                  - 15 -

1      (2) the nature and severity of the potential harm

2      (3) the likelihood that the potential harm will occur; and

3      (4) the imminence of the potential harm.

4  *Echazabal*, 336 F.3d at 1027-28. Before excluding an individual from employment as

5  a direct threat, an employer must demonstrate that is has made an individualized

6  assessment of the employee's ability to perform the essential functions of the job based

7  on a reasonable medical judgment that relies on the most current medical knowledge

8  and or the best available objective evidence. 29 C.F.R. § 1630.2(r).   Because it is an

9  affirmative defense, the burden of establishing a direct threat lies with the employer.

10 *Echazabal*,  336 F.3d at 1027; *Hutton v. Elf Atochem N. Am. Inc.*, 273 F.3d 884, 893

11 (9th Cir.2001); *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir.1999).

12     The risk must be assessed based on the "objective, scientific information."

13 *Bragdon v. Abbott*, 524 U.S. 624, 629 (1998).  A subjective belief in the existence of

14 a risk, even one made in good faith, will not shield the decisionmaker from liability. *Id.*

15 In addition,  an employer must gather "substantial information" about an employee's

16 work history and medical status. *Echazabal*, 336 F.3d at 1028 (citing *Nunes*, 164 F.3d

17 at 1248). The decision must be based upon "particularized facts using the best available

18 objective evidence as required by the regulations." *Id.* (citing *Lowe v. Ala. Power Co.*,

19 244 F.3d 1305, 1309 (11th Cir.2001);  McGregor v. Nat'l R.R. Passenger Corp., 187

20 F.3d 1113, 1116 (9th Cir.1999)).  Individualized risk assessment also requires

21 consideration of relevant information about an employee's past work history.

22 *Echazabal*, 336 F.3d at 1032; *see Nunes*, 164 F.3d at 1248; *see also Mantolete v.*

23 *Bolger*, 767 F.2d 1416, 1423 (9th Cir.1985) (holding that, in assessing elevated risk to

24 an employee under the Rehabilitation Act, the employer must "gather [and assess] all

25 relevant information regarding the applicant's work history and medical history");

26 *Anderson v. Little League Baseball, Inc.*, 794 F. Supp. 342, 345 (D. Ariz. 1992) (giving

27

28                                    - 16 -

1  "great weight" to fact of disabled plaintiff's three years of service without incident in

2  rejecting employer's direct threat defense).

3       Nez had a clean driving record and had performed his job safely and without

4  incident for 5 months. Kalil performed no assessment of Nez's fitness for the

5  merchandiser position other than the DOT physical exam. Kalil relied solely on the

6  report of the physical exam with no further investigation or individual assessment

7  regarding the risk that Gerald Nez posed due to his diabetes. The information proffered

8  by Kalil regarding Nez's non-compliance and subsequent medical history was obtained

9  during discovery and after the fact of Nez's dismissal.  It formed no part of the decision

10  to dismiss Nez.

11       In addition, Kalil failed to provide Nez with a reasonable accommodation. Kalil

12  did not offer Nez alternative, permanent job in a situation where he would not have

13  posed a risk, such as in the warehouse.

14       Kalil has not presented facts sufficient to prove that Mr. Nez provided a threat

15  to the safety of others, that they conducted an individualized assessment or that they

16  provided a reasonable accommodation.

17  VI.   Kalil is not entitled to summary judgment on the issue of intentionality.

18       Although Kalil did not show 'malice' or 'reckless indifference' in their allegedly

19  discriminatory treatment of Gerald Nez, failure to act in good-faith to provide a

20  reasonable accommodation for Nez's disability is a form of intentional discrimination.

21       The ADA defines "discriminate" as:

22       using qualification standards, employment tests of other selection criteria
         that screen out or tend to screen out an individual with a
23       disability...unless the standard, test or other selection criteria ...is shown
         to be job-related for the position in question and consistent with business
24       necessity.

25
26  42 U.S.C. § 12112(b)(6). The Civil Rights Act of 1991 established a three-tiered system

27  of remedies for discriminatory conduct. 42 U.S.C. § 1981a(b)(1); *Kolstad v. Am. Dental*

28                                    - 17 -

1  *Ass'n*, 527 U.S. 526, 547-548 (1999).  Equitable remedies are available for disparate

2  impact violations; compensatory damages for intentional disparate treatment; and

3  punitive damages for intentional discrimination "with malice or with reckless

4  indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. §

5  1981a(b)(1).

6      The Civil Rights Act of 1991 limits compensatory and punitive damage awards

7  to instances of "intentional discrimination" - that is, cases that do not rely on the

8  "disparate impact" theory of discrimination. *Id.*; *Kolstad*, 527 U.S. at 534. Section

9  1981a(b)(1) further qualifies the availability of punitive awards: it provides that a court

10  may award punitive damages to an ADA plaintiff upon proof that the defendant

11  engaged in "a discriminatory practice or  discriminatory practices with malice or

12  reckless indifference to the federally protected rights of an aggrieved individual." Id.

13  The "malice" and "reckless indifference" required to support an award of punitive

14  damages for violations of Title VII, refer not to egregiousness of the employer's

15  conduct, but rather to employer's knowledge that it may be acting in violation of federal

16  law. Civil Rights Act of 1964, §§ 701 et seq.; 42 U.S.C. §§ 2000e et seq.; 42 U.S.C. §

17  1981a(b)(1);  *Jones v. Rent-A-Center, Inc.*, 240 F. Supp. 2d 1167 (D. Kan. 2002).

18  "Thus, the proper question is whether the employer engaged in the conduct alleged with

19  the 'knowledge that it may be acting in violation of federal law.'" *Kolstad*,  527 U.S. at

20  535.  "[A]n employer must at least discriminate in the face of a perceived risk that its

21  action will violate federal law to be liable in punitive damages." Id. at 536. To be

22  entitled to punitive damages the EEOC must prove that Kalil acted with knowledge that

23  it might be acting in violation of federal law.

24      The Civil Rights Act of 1991  authorizes claims for compensatory damages,

25  when the alleged discrimination is due to either the intentional violation of the ADA or

26  an intentional failure to provide a reasonable accommodation to disability as required

27  by the ADA. 42 U.S.C. § 1981a(a)(2). However, an employer has a complete defense

28

- 18 -

1   to compensatory damages claims if it can demonstrate that it made good-faith efforts,

2   in consultation with the claimant after having been informed that accommodation was

3   needed, to make a reasonable accommodation that would provide an equally effective

4   opportunity without causing an undue hardship on the operation of the business. 42

5   U.S.C. § 1981a(a)(3).  An employer does not have to accede to every accommodation

6   demanded by an employee in order to have a valid good-faith defense to an ADA

7   compensatory damages claim. 42 U.S.C. § 1981a(b)(1).

8        "Disparate-impact" claims, under the ADA, involve employment practices that

9   are facially neutral in their treatment of different groups,  but that in fact fall more

10  harshly on one group than another and cannot be justified by business necessity.

11  *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003) on remand 362 F.3d 564;  42 U.S.C.

12  § 12112. Kalil's policy of requiring all drivers to pass the DOT physical was facially

13  neutral and applied across the board. Although drivers can fail the DOT physical for a

14  multitude of reasons, insulin-dependant diabetes is an absolute bar to passing the test.

15       While the DOT test used by Kalil seems to create simply a disparate impact, the

16  failure of Kalil to work with Nez to create a reasonable accommodation brings the

17  allegedly discriminatory treatment into the realm of intentional discrimination.

18  According to Kalil's own testimony, the only accommodation which Kalil offered to

19  Nez was a temporary position in the warehouse contingent on his passing the DOT

20  physical in 30 days. There is no record of any attempt by Kalil to make reasonable,

21  permanent accommodations to Nez's medical condition. However, there is also no

22  evidence in the record  that Nez requested an accommodation from Kalil.  A genuine

23  issue of fact exists as to whether Kalil made a good-faith effort to provide Nez with a

24  reasonable accommodation.

25  VII.   Conclusion

26       Material issues of fact exist and summary judgment should be denied on the

27  issue of  whether Gerald Nez was disabled as defined by the ADA,  on the issue of

28

- 19 -

1   intentionality, and on the Defendant's affirmative defense of business necessity.  Partial

2   Summary Judgment should be granted on the issue that Gerald Nez was terminated by

3   Kalil for failing the DOT physical and lack of factual basis to the defendant's

4   affirmative defense of direct threat.

5         Accordingly,

6         IT IS ORDERED Plaintiff's Motion for Partial Summary Judgment (Doc. No.

7   67) is GRANTED IN PART and DENIED IN PART as follows:

8         (1)   Summary Judgment is DENIED on the issue of whether Gerald Nez was

9               a qualified person with a disability at all relevant times

10        (2)   Summary Judgment is DENIED on the issue of whether Defendant's

11              affirmative defenses are factually and legally insufficient.

12        (3)   Summary Judgment is GRANTED on the issue of whether Nez was

13              terminated purely because he failed a Department of Transportation

14              medical examination.

15        IT IS FURTHER ORDERED Defendant's Motion for Summary Judgment

16   and/or Motion for Partial Summary Judgment (Doc. No. 64) is DENIED.

17        DATED this 21st day of September, 2009.

18

19

20   _____

21              Bernardo P. Velasco
              United States Magistrate Judge

22

23

24

25

26

27

28

                          - 20 -